243 S.W.3d 807 (2007)
In the Interest of M.R. and W.M., Children.
No. 2-07-163-CV.
Court of Appeals of Texas, Fort Worth.
December 13, 2007.
*810 Dean M. Swanda, Arlington, Richard A. Gladstone, Fort Worth, TX, for Appellants.
Tim Curry, Criminal District Atty., Charles M. Mallin, Assistant Criminal District. Atty., Chief of Appellate Division, Anne Swenson, David M. Curl, Clifford Bronson, Assistant Criminal District attorneys, Tarrant County, TX, for Appellees.
*811 Panel F: LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

OPINION
TERRIE LIVINGSTON, Justice.

Introduction
Appellant Erica D. (Mother) appeals the trial court's order terminating her parental rights to her two children, M.R. and W.M. Appellant W.P.M. appeals the termination of his parental rights to his son, W.M. In three issues, Mother argues that the evidence was legally and factually insufficient to support the trial court's endangerment findings and factually insufficient to support its best interest findings as to both children. In ten issues, W.P.M. contends that the trial court erroneously admitted M.R.'s outcry statements and that the evidence was factually insufficient to support the trial court's endangerment findings and best interest findings as to W.M.[1] Because we hold that the evidence was both legally and factually sufficient to support the trial court's endangerment findings, factually sufficient to support the best interest findings, and that the outcry evidence was properly admitted, we affirm.

Background Facts
On April 16, 2006, Child Protective Services (CPS) received a referral that drug use was occurring in apartment 120, on Las Vegas Trail in Fort Worth, Texas. CPS believed that Mother and her children, seven-year-old M.R. and three-year-old W.M., were staying in that apartment with. Mother's parents, her brother, her brother's girlfriend, and their baby. CPS investigator Jeannie Maxie went to the apartment, but neither Mother nor the children were there. Made asked the family members to take a drug test, but they refused. Maxie made several attempts to locate Mother at that address and at the Sonic where she worked, but she was unsuccessful in finding Mother. At one point, Maxie spoke to Mother on the phone and they set up an appointment to meet, but Mother did not show. Mother made no attempts to contact CPS.
On June 4, 2006, CPS received another referral that M.R. was wandering outside alone in front of a Motel 6.[2] On June 8, 2006, CPS removed M.R. and W.M. from Mother's custody under a court's Order for Protection of Child in Emergency. Neither father, was available to take the children. M.R.'s biological father was living in Oklahoma, and W.P.M. was incarcerated at the time of the second referral and the removal.
On June 26, 2006, CPS placed both children in foster care. While the children were in foster care, Mother repeatedly refused to follow her CPS service plan. For example, Mother refused to attend parenting classes or counseling sessions. Additionally, W.P.M. did not contact W.M.'s caseworker to inquire about W.M.'s well-being although W.P.M. did testify that he asked his family and Mother's friends for information about his son. M.R.'s father, Michael, attended the contested show cause hearing on June 29, 2006, and provided a potential relative placement for M.R. He did not show up for a scheduled visit in November, but he later contacted CPS in January 2007 and claimed that he could not make the scheduled visit because *812 he had been in rehab again. He did ask about M.R. and CPS attempted to mail him a service plan, but the plan was returned. Michael did not make any further contact with M.R. or with CPS.
At trial, the foster mother testified about outcry statements made to her by M.R. The foster mother stated that one morning while she was fixing M.R.'s hair and M.R. was brushing her teeth, M.R. was talking about how cute W.M. was as a baby and that "mommy started using drugs" about that time. The foster mother testified that M.R. talked about "when mommy started smoking" and described the pipe and "that smoke came out of the top of it." M.R. also told the foster mother "that other people were doing drugs with mom" and named W.P.M., her aunt, uncle, and grandparents. Additionally, the foster mother testified that M.R. talked about how people "would all come over and go into a room and smoke the Merry Wonka and she would be left in charge of [W.M.]" and two other babies. The foster mother also testified concerning other statements that M.R. made, such as how they found their food in dumpsters, drove around at two in the morning looking for a place to sleep, and received spankings with belts from W.P.M. M.R. did not testify at trial, although, according to CPS, the child was available to testify.
On May 10, 2007, after a three-day bench trial, the trial court terminated Mother's parental rights to M.R. and W.M. and W.P.M.'s parental rights to W.M.

Admissibility of Child's Statement
In W.P.M.'s first issue, he argues that the trial court erroneously admitted M.R.'s outcry statements because they were not reliable. Specifically, he "contends that the time, content, and circumstances of the statement[s] do not provide sufficient indications of [their] reliability."
In 1997, the Legislature amended the family code to permit the admission of hearsay statements by child victims in termination of parental rights proceedings. In re K.L., 91 S.W.3d 1, 15 (Tex.App.-Fort Worth 2002, no pet.). Section 104.006 of the Texas Family Code permits the trial court to admit a child's statement of abuse if it finds that the statement is reliable and (1) the child testifies or is available to testify at the proceeding in court or in any other manner provided for by law or (2) the court determines that the use of the statement in lieu of the child's testimony is necessary to protect the welfare of the child. See TEX FAM.CODE ANN. § 104.006 (Vernon 2002); In re S.B., 207 S.W.3d 877, 883 (Tex.App.-Fort Worth 2006, no pet.).
The term "abuse" as defined in Section 261.001 of the family code includes the following;
(A) mental or emotional injury to a child that results in an observable and material impairment in the child's growth, development, or psychological functioning;
(B) causing or permitting the child to be in a situation in which the child sustains a mental or emotional injury that results in an observable and material impairment in the child's growth, development, or psychological functioning;
...
(I) the current use by a person of a controlled substance as defined in Chapter 481, Health and Safety Code, in a manner or to the extent that the use results in physical, mental, or emotional injury to a child.
TEX. FAM.CODE ANN. § 261.001(1)(A)-(B), (I) (Vernon Supp.2007). Thus, we conclude that M.R.'s testimony falls within the family code's definition of abuse for purposes of section 104.006.
*813 Only a few cases address the reliability of a child's outcry under section 104.006. This court has previously discussed section 104.006 of the family code in In re K.L. 91 S.W.3d at 17. In that case, five witnesses, including three CPS caseworkers, a therapist, and a child advocate, testified about statements made by K.L. regarding sexual abuse. Id. at 15. The appellant claimed that the testimony was inadmissible hearsay because it did not meet the requirements of family code section 104.006. Id. We stated that section 104.006 is the civil analogue of article 38.072 of the code of criminal procedure and, using the same type of analysis employed by courts applying article 38.072, held that K.L.'s statements were admissible. Id. at 16-17.
The Houston Court of Appeals, citing In re K.L., held that a child's statements introduced in a caseworker's report were not reliable because the report did not describe the circumstances of the interview, including who was present. In re E.A.K, 192 S.W.3d 133, 147 (Tex.App.-Houston [14th Dist.] 2006, no pet.). Additionally, there was no evidence of whether the child was asked leading questions or allowed to tell what happened to her, and there was no evidence that the child understood the difference between truth and lies. Id. at 146-47.
Furthermore, the Amarillo Court of Appeals has used factors similar to those listed in article 38.072 of the code of criminal procedure to determine the reliability of a child's outcry statement. In re P.E.W., 105 S.W.3d 771, 775 (Tex.App.-Amarillo 2003, no pet.). In In re P.E.W., the Amarillo court analyzed whether the child understood the difference between truth and lies, whether the statements were voluntary or the result of questioning, whether a child of his age would normally know about the matters he described, and whether the statements could be corroborated by other evidence. Id. at 775. Using these factors, the court determined the statements were reliable. Id. at 776.
Similarly, article 38.072 of the code of criminal procedure provides a mechanism that requires that the trial court determine on a case-by-case basis if outcry testimony reaches the level of reliability required to be admissible as an exception to the hearsay rule. TEX.CODE CRIM. PROC. ANN. art. 38.072 (Vernon 2005); Norris v. State, 788 S.W.2d 65, 70 (Tex.App.-Dallas 1990, pet. ref'd). Indicia of reliability that a trial court may consider under 38.072 include (1) whether the child victim testifies at trial and admits making the out-of-court statement, (2) whether the child understands the need to tell the truth and has the ability to observe, recollect, and narrate, (3) whether the other evidence corroborates the statement, (4) whether the child made the statement spontaneously in his own terminology or whether evidence exists of prior prompting or manipulation by adults, (5) whether the child's statement is clear and unambiguous and rises to the needed level of certainty, (6) whether the statement is consistent with other evidence, (7) whether the statement describes an event that a child of the victim's age could not be expected to fabricate, (8) whether the child behaves abnormally after the contact, (9) whether the child has a motive to fabricate the statement, (10) whether the child expects punishment because of reporting the conduct, and (11) whether the accused had the opportunity to commit the offense. Norris, 788 S.W.2d at 70.

Analysis
Under section 104.006, and by comparison article 38.072, a court may use a child's understanding of the difference Between truth and lies in assessing the reliability of a child's outcry. P.E.W., 105 *814 S.W.3d at 775. Here, both the foster mother and Mother stated that M.R. is adamant about telling the truth. See id. M.R. had no history of exaggeration or fibs. Also, it is reasonable to deduce that a seven-year-old child could describe the occurrences involved because she experienced them firsthand. See id. at 776.
Additionally, other evidence corroborates the content of M.R.'s statements. See id.; see also Norris, 788 S.W.2d at 70. For example, M.R. said that her mother began smoking "Merry Wonka" after W.M. was born. Mother admitted that she frequently stayed with her parents and that her parents and others living in the house smoked marijuana. Mother also admitted that M.R. probably was not lying if she saw people doing drugs in front of her. M.R. also stated that W.P.M. was one of the people doing drugs with Mother. At trial, when W.P.M. was asked if he used drugs, he repeatedly invoked the Fifth Amendment. Additionally, W.P.M.'s probation was revoked on a possession of methamphetamine offense. M.R. said that she had to sleep in cars, and that she, W.M., and Mother would drive around until two or three in the morning trying to find a place to sleep. She also talked about waiting in the car while her mom would go inside to bars. Mother testified that she worked at a dance club as a cocktail waitress. M.R. talked about how she and W.M. would get spankings with belts wearing no clothes. She said that in one incident W.P.M. hit Mother while W.M. was in Mother's arms and that Mother was knocked to the ground. Initially, Mother denied any domestic abuse by W.P.M. although she did testify to an incident in which W.P.M. tried to whip M.R. Later, Mother stated that W.P.M. did "smack" her. This evidence corroborates M.R.'s statements. Also, M.R. was available to testify, but W.P.M. chose not to call her to testify.
W.P.M. argues that the hearsay came "from a highly interested witness" and that the "reliability of the foster mother was inherently suspect." W.P.M. appears to be challenging the reliability of the outcry statements by challenging the foster mother's, reliability in recounting the statements. We find no cases addressing a similar issue under section 104.006; thus, to complete our analysis, we look to article 38.072 of the code of criminal procedure for guidance in applying family code section 104.006 to this issue. See K.L., 91 S.W.3d at 16.
The reliability referred to in article 38.072 is the reliability of the child's declaration, not the witness relaying the child's declaration. Holland v. State, 770 S.W.2d 56, 59 (Tex.App.-Austin 1989), aff'd, 802 S.W.2d 696 (Tex.Crim.App.1991); see also Duran v. State, 163 S.W.3d 253, 256 n. 1 (Tex.App.-Fort Worth 2005, no pet.). W.P.M. is challenging the credibility of the foster mother because of her motivation to adopt the children; however, the trier of fact is the judge of credibility. In re J.J.R., 669 S.W.2d 840, 843 (Tex.App.-Amarillo 1984, writ dism'd.); see also Margraves v. State, 34 S.W.3d 912, 919 (Tex. Crim.App.2000). Thus, in our analysis of this complaint, we look to evidence concerning the reliability of M.R.'s statements to the foster mother, such as whether the statements were spontaneous, whether CPS protocol was followed, and whether the child's therapist or counselor was contacted by the witness after the outcry, thereby allowing the counselor or therapist to talk with the child further and properly question the child about the incident. See Holland, 770 S.W.2d at 59.
Here, there is no evidence that the foster mother solicited information from M.R. M.R. and the foster mother were in the bathroom, getting ready for school one *815 morning, when W.M. woke up and walked in. M.R. began talking about how cute W.M. was when he was a baby and how she wished the foster mother could have seen him as a baby. As M.R. talked, she made outcry statements about her life with Mother and. W.P.M. The evidence showed that the foster mother followed CPS protocol by not asking M.R. any follow-up questions, by contacting CPS soon after the outcry, and by allowing M.R.'s therapist to question M.R. further. See id. Moreover, the foster mother's testimony about the outcry was brief and not contrived. Id. Thus, in this case, the trial judge as the trier of fact had evidence before him that the circumstances of the outcry were reliable. By ruling that the evidence was admissible, the trial judge implicitly determined that the foster mother was not fabricating what M.R. told her and concluded that the child's declaration was sufficiently reliable under 104.006.
In sum, although the outcry statements are not definite as to time,[3] the specificity of the content and circumstances existing at the time of the outcry demonstrate the statements' veracity. Furthermore, there is evidence in the record "touching upon various indicia which courts often use to assess the reliability of a child's outcry." P.E.W., 105 S.W.3d at 776. More importantly, comparing those indicia to the evidence here supports the conclusion that the trial court did not abuse its discretion by determining that M.R.'s statements were reliable; thus the trial court did not erroneously admit the statements. See id; see also K.L, 91 S.W.3d at 17. We overrule W.P.M.'s first issue.

Sufficiency of the Evidence

A. Issues Addressed
In his second through eighth issues, W.P.M. challenges the legal and factual sufficiency of the evidence to support the termination under the grounds listed in family code sections 161.001(1)(D), (E), (N)[4] and 161.002(b)(1)-(2).[5] In his ninth *816 issue, W.P.M. challenges the factual sufficiency of the evidence to support the trial court's finding that termination was in W.M.'s best interest. The State has conceded W.P.M.'s second, third, fourth, fifth, and eighth issues challenging the sufficiency of the evidence for termination.
In three issues, Mother argues that the evidence was legally and factually insufficient to support the trial court's endangerment and factually insufficient to support its best interest findings as to both children.

B. Standard of Review
A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." Santosky v. Kramer, 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex.2003); S.B., 207 S.W.3d at 884. "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." In re C.H., 89 S.W.3d 17, 26 (Tex.2002); S.B., 207 S.W.3d at 884. In a termination case, the State seeks not just to limit parental rights but to end them permanently-to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. TEX. FAM.CODE ANN. § 161.206(b) (Vernon Supp.2007); Holick v. Smith, 685 S.W.2d 18, 20 (Tex.1985); S.B., 207 S.W.3d at 884. We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. Holick, 685 S.W.2d at 20-21; S.B., 207 S.W.3d at 884; In re E.S.S., 131 S.W.3d 632, 636 (Tex.App.-Fort Worth 2004, no pet.).
Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence. TEX. FAM.CODE ANN. §§ 161.001, 161.206(a); In re J.F.C., 96 S.W.3d 256, 263 (Tex.2002); S.B., 207 S.W.3d at 884. This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. In re G.M., 596 S.W.2d 846, 847 (Tex.1980); S.B., 207 S.W.3d at 884; In re K.W, 138 S.W.3d 420, 425 (Tex.App.-Fort Worth 2004, pet. denied). It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE ANN. § 101.007 (Vernon 2002); S.B., 207 S.W.3d at 884.

1. Legal sufficiency standard of review
The higher burden of proof in termination cases elevates the appellate standard of legal sufficiency review. J.F.C., 96 S.W.3d at 265; S.B., 207 S.W.3d at 884. The traditional no-evidence standard does not adequately protect the parents' constitutional interests. J.F.C., 96 S.W.3d at 265; S.B., 207 S.W.3d at 884. In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. J.F.C., 96 S.W.3d at 265-66; S.B., 207 S.W.3d at 884. We must review all the evidence in the light most favorable to the finding and judgment. J.F.C., 96 S.W.3d *817 at 266; S.B., 207 S.W.3d at 884. This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. J.F.C., 96 S.W.3d at 266; S.B., 207 S.W.3d at 884. We must also disregard all evidence that a reasonable factfinder could have disbelieved. J.F.C., 96 S.W.3d at 266; S.B., 207 S.W.3d at 885. We must consider, however, undisputed evidence even if it is contrary to the finding. J.F.C., 96 S.W.3d at 266; S.B., 207 S.W.3d at 885. That is, we must consider evidence favorable to termination if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex.2005); S.B., 207 S.W.3d at 885.

2. Factual Sufficiency Standard of Review
This higher burden of proof also elevates the appellate standard of factual sufficiency review. C.H., 89 S.W.3d at 25; S.B., 207 S.W.3d at 885. "[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." C.H., 89 S.W.3d at 25; S.B., 207 S.W.3d at 885. In considering whether the evidence of termination rises to the level of being clear and convincing, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. C.H., 89 S.W.3d at 25; S.B., 207 S.W.3d at 885. Our inquiry here is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated one of the conduct provisions of section 161.001(1) and that the termination of the parent's parental rights would be in the best interest of the child. C.H., 89 S.W.3d at 28; S.B., 207 S.W.3d at 885.
The distinction between legal and factual sufficiency lies in how we review the evidence. J.F.C., 96 S.W.3d at 266. In a factual sufficiency review, in determining whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that its finding was true, we must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. Id. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. Id. If we reverse on factual sufficiency grounds, then we must detail in our opinion why we have concluded that a reasonable factfinder could not have credited disputed evidence in favor of its finding. Id. at 266-67.

C. Paternity and Constructive Abandonment
Because the State concedes W.P.M.'s second, third, fourth, fifth, and eighth issues challenging sufficiency of the evidence for termination, we sustain these issues. However, the trial court need only find one ground to terminate; thus, we will examine the sufficiency of the evidence as to the other grounds found by the trial court. See P.E.W., 105 S.W.3d at 774.

D. Endangerment Findings
W.P.M. argues that the evidence is factually insufficient to support the trial court's findings that he engaged in conduct or knowingly placed W.M. with persons engaged in conduct which endangered W.M.'s physical or emotional well-being. TEX. FAM CODE ANN. § 161.001(1)(D), (E). Mother also argues that the evidence is *818 legally and factually insufficient to support the trial court's findings that she engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the children's physical or emotional well-being. Id.
In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001; In re J.L., 163 S.W.3d 79, 84 (Tex.2005); S.B., 207 S.W.3d at 884. Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.1987); S.B., 207 S.W.3d at 884.

1. Analysis of Mother's Claims
Here, there was evidence that the children were exposed to domestic violence. Mother testified that she and W.P.M. had several disputes that involved screaming. Furthermore, Mother admitted that W.P.M. "smacked" her in front of M.R. There was also conflicting evidence about an incident when W.P.M. hit Mother. with W.M. in her arms in front of M.R.
Further, Mother admitted to using both marijuana and methamphetamines in the past. Although Mother stated at trial that she was clean, she did not know when she last used drugs.[6] In addition, since her children were removed, Mother refused to take thirteen of the fifteen requested UAs and hair follicle tests. Mother repeatedly stated that she could not remember why she did not show up to take the tests but said, "I shouldn't have to do that. I don't have to go do that." Furthermore, there is evidence that Mother allowed her children to be in an environment where she knew drug abuse occurred. Mother acknowledged that, at times, she lived with her parents, who actively used drugs in the home. Additionally, M.R. said that when her grandparents, aunt, uncle, and W.P.M. smoked, she would be in charge of watching W.M. and two other babies.
The evidence also shows that Mother refused to participate in her CPS service plan. Mother admitted that she did not complete a drug assessment, parenting classes, counseling sessions, or the requested drug tests, all of which were required by her service plan. Additionally, Mother failed to obtain housing or employment. The record indicates that Mother was defiant when asked questions about her lack of participation in her CPS service plan, but she also admitted that she did not keep track of dates and names.
The record also contains other evidence that indicates endangerment to the children. For example, Mother ran from CPS by taking the children out of voluntary placement and actively hid from CPS for four to five months. In addition, Mother followed the foster mother's vehicle while the children were in the car with the foster mother. The evidence shows that Mother was screaming at the foster mother's car while Mother hung out the window of her car trying to get her children's attention. M.R. saw Mother's actions and was upset by the incident. Furthermore, the evidence shows that Mother failed to supervise the children properly. CPS investigated two incidents that involved M.R. wandering alone around an apartment complex.
*819 Despite Mother's repeated claims that she loved her kids and was a good mom, the evidence shows that Mother exposed her children to domestic violence, placed them in an environment of drug abuse, and refused to participate in her CPS service plan. Based on our review of the entire record, we conclude that a factfinder could reasonably form a firm belief or conviction that Mother (1) engaged in conduct that endangered the physical or emotional well-being of M.R. and W.M. and (2) knowingly placed or knowingly allowed her children to remain in conditions or surroundings that endangered their physical and emotional well-being. Therefore, we hold that the evidence is legally and factually sufficient to support the trial court's findings under section 161.001(1)(D) and (E). TEX. FAM.CODE ANN. § 161.001(1)(D), (E); see S.B., 207 S.W.3d at 885. We overrule Mother's first and second issues.

2. Analysis of W.P.M.'s Claims
W.P.M., at the time of trial, was incarcerated for burglary of a habitation after violating his community supervision by possessing methamphetamines. The burglary offense occurred before W.P.M. knew that Mother was pregnant with W.M. W.P.M. received community supervision for that offense, but a few months after W.M. was born, he violated his community supervision and received a two-year sentence. W.P.M. had also been adjudicated guilty of forgery of a government document and family violence.
A voluntary, deliberate, and conscious course of conduct by a parent is grounds for termination under subsection (E) of 161.001. In re D.M., 58 S.W.3d 801, 812 (Tex.App.-Fort Worth 2001, no pet.) (explaining that under subsection (E) a court may order termination of parental rights if that parent has engaged in conduct or knowingly placed the child with persons "engaging in conduct which endangers the physical or emotional well-being of the child"). Imprisonment alone does not constitute endangering conduct; however, it is a fact to consider on the issue of endangerment. Id. The State must show that the incarceration is a part of a course of conduct that is endangering the child. Id.
W.P.M. had been incarcerated twenty-six-months of W.M.'s thirty-six-month life. W.P.M.'s incarceration had affected his ability to ensure that W.M. was properly taken care of and indicated a course of conduct that was endangering to his child. Moreover, W.P.M.'s incarceration prevented him from funding better living conditions and financially supporting W.M. The evidence showed that W.P.M.'s continued criminality had contributed to the dangerous environment in which W.M. had lived.
The evidence also shows that W.P.M. was aware that Mother sporadically lived with her parents and that her parents were drug users. Instead of avoiding a criminal lifestyle, W.P.M.'s decisions prevented him from having a role in his son's life or providing any support. The evidence also demonstrated that W.P.M. used drugs.
Based on our review of the entire record, we conclude that a factfinder could reasonably form a firm belief or conviction that W.P.M. engaged in conduct and knowingly placed W.M. with persons who engaged in conduct which endangered the physical or emotional well-being of W.M. Therefore, we hold that the evidence is factually sufficient to support the trial court's findings under section 161.001(1)(E). See S.B., 207 S.W.3d at 885. We overrule W.P.M.'s seventh issue.[7]

*820 E. Best Interest of Children
Mother and W.P.M. both argue that the evidence is insufficient to prove that termination of the parent-child relationship was in the children's best interest.
Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include the following:
(1) the desires of the child;
(2) the emotional and physical needs of the child now and in the future;
(3) the emotional and physical danger to the child now and in the future;
(4) the parental abilities of the individuals seeking custody;
(5) the programs available to assist these individuals to promote the best interest of the child;
(6) the plans for the child by these individuals or by the agency seeking custody;
(7) the stability of the home or proposed placement;
(8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and
(9) any excuse for the acts or omissions of the parent.
Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex.1976); S.B., 207 S.W.3d at 886.
These factors are not exhaustive. Some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. C.H., 89 S.W.3d at 27; S.B., 207 S.W.3d at 886. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the children. C.H., 89 S.W.3d at 27; S.B., 207 S.W.3d at 886. On the other hand, the presence of scant evidence relevant to each Holley factor will not support such a finding. C.H., 89 S.W.3d at 27; S.B., 207 S.W.3d at 886.

1. Domestic Violence and Drug Abuse Evidence
In this case, there is evidence that M.R. and W.M. have been exposed to domestic violence and drug abuse. Mother has shown no desire or taken any action to modify her behavior in this respect. Moreover, M.R. is aware of the abuse and neglect. M.R. told her foster mother that "mommy started using drugs after [W.M]. was born." She called the drugs "Merry Wonka" and described the pipe and that smoke came out the top. M.R. also said that when her grandparents, aunt, uncle, and W.P.M. smoked, she would be in charge of watching W.M. and two other babies. These instances support the trial court's finding that termination is in the best interest of the children. See S.B., 207 S.W.3d at 887.

2. Placement of the Children
When M.R. and W.M. were initially placed in foster care, M.R. had taken on the role of mother to W.M., and the children were very bonded to each other. W.M. could not talk and was not potty-trained. M.R. had eating problems and refused to eat anything but junk food. Since being with their foster family, both children have flourished and adjusted to their new life. W.M. took speech therapy and was potty-trained. M.R. visited a therapist and had relinquished her motherly duties. Moreover, the caseworker recommended *821 that Mother and W.P.M.'s parental rights be terminated. The foster family wanted to adopt both M.R. and W.M. Although W.P.M. was incarcerated at the time of trial and his release date was not certain, he argued that. W.M. should live with W.P.M.'s mother; however, this would mean that W.M. would be separated from M.R. W.M. and M.R. had a very strong brother-sister bond and separating them would "totally destroy their whole demeanors, personalities, their identities" according to the foster mother. The evidence showed that allowing the children to remain together would be in their best interest.
Further, the evidence here shows that M.R. and W.M.'s lifestyle improved after CPS placed them with the foster family, supporting the trial court's finding that termination was in the children's best interest. See S.B., 207 S.W.3d at 887.

3. Evidence of an Unstable Lifestyle
Evidence of a parent's unstable lifestyle can also support a factfinder's conclusion that termination is in the child's best interest. S.B., 207 S.W.3d at 887-88; In re D.S., 176 S.W.3d 873, 879 (Tex.App.-Fort Worth 2005, no pet.). A parent's drug use, inability to provide a stable home, and failure to comply with a family service plan support a finding that termination is in the best interest of the child. S.B., 207 S.W.3d at 887-88; D.S., 176 S.W.3d at 879. Mother testified that she did not complete aspects of her service plan, including a drug assessment, parenting classes, counseling sessions, or the requested drug tests. Mother also failed to obtain housing or employment. Additionally, the record shows Mother's lack, of participation in her CPS service plan. Evidence at trial also showed that the children slept in cars while Mother drove around trying to find a place for them to sleep. M.R. stated that she stayed in the car with a man while her Mother went into bars. The evidence also showed that M.R. had to find food in dumpsters.
At the time of trial, W.P.M. was incarcerated with a projected release date of August 18, 2007. See S.B., 207 S.W.3d at 887-88. In fact, W.P.M. had been incarcerated for most of W.M.'s three-year life. A trial court may consider incarceration as a best-interest factor. S.B., 207 S.W.3d at 887-88; see In re J.B.W., 99 S.W.3d 218, 229 (Tex.App.-Fort Worth 2003, pet. denied) (holding that incarceration is one factor courts can consider when determining the best interest of a child in a termination case).

4. Parental Rights as to Other Children
Both appellants have additional children being raised by other people.[8] Mother's parental rights to her first two children were terminated in Oklahoma, and a third child is being raised by his father in Fort Worth. W.P.M. has a daughter being raised by her grandparents in New Mexico. He had not seen her since Christmas of 2003. The evidence also showed that prior to this trial, W.P.M. had not written any letters to the caseworker inquiring about W.M. See S.B., 207 S.W.3d at 888. Mother had not completed any tasks on her CPS service plan, including the requested drug tests. Id. Furthermore, Mother had a confrontation with the foster mother about doctor-prescribed medication for W.M. Mother and W.P.M.'s forfeiture *822 of their parental rights to other children and their inability to fallow court orders, avoid drug use, and maintain a stable lifestyle supports the conclusion that termination is in the children's best interest. S.B., 207 S.W.3d at 887.
Based upon our review of the entire record, we conclude that the trial court could have reasonably formed a firm conviction or belief that termination of Mother's and W.P.M.'s rights was in M.R.'s and W.M.'s best interest. See S.B., 207 S.W.3d at 888. Therefore, we hold that the evidence is factually sufficient to support the trial court's finding that termination is in M.R.'s and W.M.'s best interest.
Accordingly, we overrule Mother's third issue and W.P.M.'s ninth issue.

Conclusion
Having overruled all of Mother's and W.P.M.'s diapositive issues,[9] we affirm the trial court's judgment.
NOTES
[1] At the time of trial, M.R.'s biological father, Michael, lived in Oklahoma City, Oklahoma. He filed a general denial and his counsel appeared at trial; however, he was not present. The trial court terminated his parental rights, and he does not appeal the judgment.
[2] The record is not clear regarding the time of day M.R. was found wandering outside alone; however, the record does state that the CPS Night Response unit conducted the removal.
[3] The foster mother testified that M.R. made the statements one morning before school, but she did not specify as to what day or exact time.
[4] Subsections (D), (E), and (N) of section 161.001(1) provide that a parent's rights may be terminated if the court finds by cleat and convincing evidence that the parent has

(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child,
(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child, or
(N) constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Protective and Regulatory Services or an authorized agency for not less than six months, and
(i) the department or authorized agency has made reasonable efforts to return the child to the parent,
(ii) the parent has not regularly visited or maintained significant contact with the child, and
(iii) the parent has demonstrated an inability to provide the child with a safe environment.
TEX. FAM.CODE ANN § 161.001(1)(D), (E), (N) (Vernon Supp.2007).
[5] Section 161.002(b)(1)-(2) states that the rights of an alleged father may be terminated if:

(1) after being served with citation, he does not respond by timely filing an admission of paternity or a counterclaim for paternity under Chapter 160 or
(2) he has not registered with the paternity registry under Chapter 160, and after the exercise of due diligence by the petitioner:
(A) his identity and location are unknown or
(B) his identity is known but he cannot be located.
TEX. FAM.CODE ANN. § 161.002(b)(1)-(2) (Vernon Supp.2007).
[6] Mother did not clarify this statement; therefore, it is unclear how recently she may have used drugs.
[7] Because only one of the acts or omissions enumerated under subdivision (1) of section 161.001 needs to be established, we do not address W.P.M.'s sixth issue, complaining of the factual sufficiency of the evidence to support termination under section 161.001(1)(D). See S.B., 207 S.W.3d at 886.
[8] Although the family code provides grounds for termination of parental rights to one child based on termination of parental rights to another child, in this case, termination of Mother's parental rights to two of her children in Oklahoma is only a factor the court considers. See TEX. FAM.CODE ANN. § 161.001(1)(M).
[9] We do not address W.P.M.'s tenth issue, which was brought in the alternative in the event that we determine that any of his other nine issues were not preserved. See Tax. R.App. P. 47.1; Reynolds v. Murphy, 188 S.W.3d 252, 258 (Tex.App. Fort Worth 2006. pet. denied); In re J.W., 97 S.W.3d 818, 825 (Tex.App.-Dallas 2003, pet. denied).