

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-13-00183-CV

IN THE INTEREST OF A.J.D., A
CHILD

----------

FROM THE 211TH DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant W.H. (Father) appeals the trial court's order terminating his parental rights to his daughter, A.J.D. (Abby).[2]  In three issues, Father contends that the evidence is insufficient to sustain the trial court's findings supporting its termination decision.  We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

[2]To protect A.J.D.'s anonymity, we will use "Abby" as her alias.  *See* Tex. Fam. Code Ann. § 109.002(d) (West Supp. 2012); Tex. R. App. P. 9.8(b)(2).

**Background Facts**

After A.D. (Mother) met Father through mutual friends and dated him for approximately eight months, she conceived Abby with him in 2003 and gave birth to Abby in June 2004.  At the time of Abby's birth, Father was twenty-one years old, had moved from Texas to New York, and was incarcerated.[3]  When Mother learned that she was pregnant with Abby, she immediately informed Father.  Father never questioned his parentage of Abby.  After Abby's birth, Father never came to Texas to visit her, and according to Mother, Father called to check on Abby only about two dozen times in the five years following her birth.

Father never paid child support to Mother for Abby's care.  He has been confined almost all of Abby's life.  His family never contacted Mother or Mother's mother (Grandmother), who Abby eventually lived with, to express an interest in being a part of Abby's life.  Regarding Father's failure to visit Abby, Mother testified at trial, "He never got the opportunity to come to Texas to visit her in person because of his incarceration.  He's basically been incarcerated since before her birth, . . . in and out as far as I've totally known."

In June 2011, the Department of Family and Protective Services (the Department) received a referral alleging that Mother was using drugs and was engaging in domestic violence with her new boyfriend, Adam, who was living with Mother.  That month, Mother tested positive for using methamphetamine, and

---

[3]Father testified that he last saw Mother in September 2003.

Abby began living with Grandmother.[4]  The Department asked Mother to complete services such as a substance abuse assessment and random drug tests.  Mother did not complete all of the services requested by the Department, and in December 2011, shortly after giving birth to a second child, she tested positive for methamphetamine.  That same month, the Department filed a petition to seek the legal removal of Abby and the other child from Mother's custody, and the Department also sought termination of Mother's and Father's parental rights to Abby if reunification could not be achieved.

Mother has struggled with abusing drugs—marijuana, cocaine, and methamphetamine—throughout her adolescence and adulthood.  She attended a substance abuse program during the course of the Department's case, but she was eventually discharged from the program for failing a drug test.

Father was served with the Department's petition in January 2012 by certified mail because he was confined in New York.  For months after the Department filed its petition, its goal for Abby remained reunification with her family.  The Department filed a family service plan in May 2012 that advised Father to, among other tasks, stop committing criminal acts, attend weekly

---

[4]Near that same time, Mother smoked methamphetamine repeatedly while pregnant with a child fathered by Adam; she admitted at trial that this conduct endangered that child's physical and emotional well-being.  Mother continued to use illegal drugs through near the time of the December 2012 termination trial.  From January 2012 through the termination trial, Mother used methamphetamine a "dozen or so times."

counseling sessions, maintain stable housing and employment, and participate in an assessment relating to substance abuse.

In July 2012, a New York deputy sheriff personally served process on Father. The trial court appointed counsel to represent Father in December 2012, and he filed an answer that month, through counsel, in which he generally denied the allegations in the Department's petition and asked to be named Abby's managing conservator, although he was still confined at that time.

Father did not physically appear at the termination trial. The trial court received his testimony through a telephone call and an unsworn, written declaration. After receiving the parties' presentation of evidence and arguments at a hearing that began in December 2012, was continued by the trial court, and concluded in January 2013, the trial court terminated Mother's and Father's parental rights to Abby. With respect to Father, the trial court found that he had engaged in conduct that had endangered Abby's physical and emotional well-being, that he had failed to support Abby in accordance with his ability during a period of one year ending within six months of the date that the Department filed its petition, and that termination was in Abby's best interest.[5] The trial court

---

[5]*See* Tex. Fam. Code Ann. § 161.001(1)(E), (F), (2) (West Supp. 2012). Although Father challenges the sufficiency of the evidence to support a finding under section 161.001(1)(D) of the family code, the trial court did not make a finding under subsection (D). *See id.* § 161.001(1)(D) (authorizing termination when a parent has knowingly placed or knowingly allowed a child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child).

4

named the Department as Abby's permanent managing conservator. Father unsuccessfully sought a new trial and brought this appeal.[6]

After Father filed his notice of appeal, the trial court entered findings of fact and conclusions of law. The court found, among other facts, that before Abby's birth, Father had sold cocaine and had received convictions for making terroristic threats and possessing marijuana; that Father and Mother had smoked marijuana together; that Father had left Texas for New York in 2003 and had learned shortly thereafter that Mother was pregnant with Abby; and that while in New York and after Abby's birth, Father had "engaged in a continuing course of criminal conduct" (including burglary and larceny) and had been "in and out of jail during the entirety of the child's life." The trial court also found that Father had made "little effort to build a relationship with [Abby] or be involved in her life," that he had never met her, and that he had never financially supported her. Finally, the trial court found that Father could not provide Abby with a safe and stable environment; that Father's family had not had personal contact with Abby; and that Father was, at that time, facing one to three years' incarceration for a criminal charge and a parole violation.

### Evidentiary Sufficiency

In three issues, Father argues only that the evidence is insufficient to sustain the trial court's findings that support the termination of his parental rights

---

[6]Mother did not appeal the termination of her parental rights to Abby.

to Abby.  In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit.  Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).  Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures."  *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)).  We strictly scrutinize termination proceedings in favor of the parent.  *Id.*; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence.  Tex. Fam. Code Ann. §§ 161.001, .206(a).  Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'"  *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002).  Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  Tex. Fam. Code Ann. § 101.007 (West 2008).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is

6

in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated a provision of section 161.001(1) and that termination of the parent-child relationship is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

**Endangerment**

In his first issue, Father contends that the evidence is legally and factually insufficient to prove that he engaged in conduct that endangered Abby's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(E). To endanger means to expose to loss or injury or to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts or failures to act. *J.T.G.*, 121 S.W.3d at 125. But the parent's endangering conduct need not be directed toward the child or occur in the child's presence, and in assessing endangerment, courts may look to parental conduct occurring both before and after the child's birth. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *R.W.*, 129 S.W.3d at 739. A parent's lack of significant contact with a child may also endanger the child's physical or emotional well-being. *See In re U.P.*, 105 S.W.3d 222, 233 (Tex. App.—Houston

8

[14th Dist.] 2003, pet. denied) (op. on reh'g); *see also In re B.R.*, No. 02-11-00146-CV, 2011 WL 5515502, at *6 (Tex. App.—Fort Worth Nov. 10, 2011, no pet.) (mem. op.); *In re B.A.*, No. 14-00-00047-CV, 2001 WL 578314, at *3 (Tex. App.—Houston [14th Dist.] May 31, 2001, no pet.) (not designated for publication).

Although imprisonment standing alone does not constitute a continuing course of conduct that endangers the physical or emotional well-being of a child, it is a factor that we may properly consider on the issue of endangerment. *In re E.N.C.*, 384 S.W.3d 796, 805 (Tex. 2012); *Boyd*, 727 S.W.2d at 533–34; *In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.). When incarceration affects the parent's ability to care for his child, to provide safe living conditions, or to ensure the child's safety and well-being, then such incarceration can be a part of a course of endangering conduct. *See M.R.*, 243 S.W.3d at 819. Even evidence of criminal conduct, convictions, and imprisonment prior to the birth of a child can support a finding that a parent engaged in a course of conduct that endangered the child's well-being if the Department introduces evidence concerning the offenses and establishes that the offenses were part of a voluntary course of conduct that endangered the child's well-being. *In re A.J.M.*, 375 S.W.3d 599, 606 (Tex. App.—Fort Worth 2012, pet. denied) (op. on reh'g) (en banc).

Father argues that the evidence is insufficient to support the trial court's finding under subsection (E) because he did not cause Abby's removal from

9

Mother's care, because he did not have "foreknowledge of . . . Mother's inability to care for the child,"[7] because he has never seen Abby, and because he has rarely spoken to her. We recently considered a termination appeal in which a father had engaged in a continuous course of criminal conduct and had seen his son only twice during the child's life. *See In re S.L.-E.A.*, No. 02-12-00482-CV, 2013 WL 1149512, at *1 (Tex. App.—Fort Worth Mar. 21, 2013, pet. denied) (mem. op.). The father argued that the evidence was insufficient to support a finding under subsection (E) because his conduct had not posed any danger to his son and because he had never possessed his son. *Id.* at *7. We affirmed the termination of the father's parental rights, explaining in part,

> Here, *the fact that Father was not present when S.L.-E.A. was removed and never had possession of S.L.-E.A. does not preclude the trial court's finding of endangering conduct; a child's emotional well-being can be negatively affected when parents repeatedly commit criminal acts that subject them to incarceration that results in their being absent from the child's life and unable to provide support*, thus creating an emotional vacuum in the child's life and subjecting the child to ongoing uncertainty regarding who will care for him. *See In re B.P.W.*, No. 02-05-00288-CV, 2006 WL 2507340, at *2 (Tex. App.—Fort Worth Aug. 31, 2006, no pet.) (mem. op.).
>
> As set forth above, the record contains seven judgments related to various crimes committed by Father. . . . Father admitted that he had a long criminal history and agreed that he had engaged in a continuing course of criminal conduct. Father's testimony regarding his instability reveals that his criminal violations and incarcerations affected his ability to provide a stable living environment for S.L.-E.A.

---

[7]We note that the record establishes Father's knowledge of Mother's illegal drug use to at least some extent because Mother testified that she had used marijuana with Father before he moved to New York.

10

*Id.* at *8–9 (emphasis added).

Similarly, in *M.R.*, a father had a significant criminal history, including being incarcerated for burglary at the time of a termination trial. 243 S.W.3d at 819. We affirmed a trial court's termination of the father's parental rights under subsection (E), stating that the father had

> been incarcerated twenty-six-months of [the child's] thirty-six-month life. [The father's] incarceration had affected his ability to ensure that [the child] was properly taken care of and indicated a course of conduct that was endangering to his child. Moreover, [the father's] incarceration prevented him from funding better living conditions and financially supporting [the child]. The evidence showed that [the father's] continued criminality had contributed to the dangerous environment in which [the child] had lived.

*Id.*; *see also In re N.K.*, 399 S.W.3d 322, 330 (Tex. App.—Amarillo 2013, no pet.) (explaining that a "parent's continuation of . . . criminal activity, despite knowledge that parental rights are in jeopardy, may . . . support[] a finding of endangerment under section 161.001(1)(E)"); *In re V.V.*, 349 S.W.3d 548, 555–57 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (en banc) (holding that evidence was legally sufficient to support a trial court's section 161.001(1)(E) finding because a father had an extensive criminal history and made no effort to care for his daughter when he was not incarcerated); *In re A.H.*, No. 02-12-00096-CV, 2012 WL 4450490, at *7–8 (Tex. App.—Fort Worth Sept. 27, 2012, no pet.) (mem. op.) (holding that evidence was legally sufficient to support a trial court's section 161.001(1)(E) finding because a mother's drug use, unstable work and housing history, decisions to leave her children with known drug users, and

history of criminal violations and incarcerations affected her ability to provide a stable living environment for her child).

Father's criminal acts occurring before and after his knowledge of the Department's case against him deprived Abby of any care and protection that he could have provided as a parent. Father's criminal history includes June 2001 convictions for making a terroristic threat and for possessing marijuana; multiple convictions for burglary;[8] April 2005 convictions for unauthorized use of a vehicle, petit larceny, and driving while impaired; a December 2009 conviction for driving while impaired; a January 2010 conviction for promoting prison contraband (by possessing marijuana while confined); and a July 2012 guilty plea for attempted reckless endangerment that occurred in March 2012 (which was after Father's knowledge of the Department's petition for the termination of his parental rights).

When he testified by telephone at trial, Father was being confined for a parole violation related to a burglary conviction and for attempted reckless endangerment. He was "looking at one to three" years if his parole was revoked, and because he had already been confined for about a year, he was possibly facing another year in prison. Father testified that he wanted Abby to live with his

_____

[8]In approximately November 2003, after he had moved to New York, Father committed burglary. He received a punishment of six months' confinement and five years' probation for that offense. About two weeks after being released from confinement for his first burglary offense, the police arrested Father for committing burglary again.

12

family in New York, but he recognized that his family had not intervened in Abby's case.

Beyond Father's criminality, which precluded his physical protection of Abby,[9] he engaged in conduct that limited his emotional connection with her and eliminated any support of her. According to Mother, Father checked on Abby only about two dozen times in the five years following her birth. Also, Father called Grandmother only "a couple of times" to speak with Abby after the Department legally removed Abby from Mother's custody in December 2011, with the last such call occurring around February 2012. According to Grandmother, when Father called in December 2011, Abby did "[n]ot really" recognize who he was, and he spoke to her for only three to five minutes. Father was released from confinement for part of 2011 when he finished serving time in a parole house, and although he lived with his mother and his fiancée during several months that year, he did not contact Abby.[10]

_____

[9]We note that while Father was physically absent from Abby's life, Mother may have cared for Abby at times when she was under the influence of methamphetamine. Mother used methamphetamine in her bedroom, which Abby had access to.

[10]Father testified that in August 2009, he lost contact with Mother because her phone was disconnected, he did not know her address, and Mother denied requests by his family members to interact with her on Facebook. He stated that he did not know where Mother was again until near Christmas in 2011, when CPS contacted him about Abby's case. Father did not testify about whether or how he attempted to find Mother or Abby in 2011 upon his release from the parole house.

Since June 2011, when Abby began living with Grandmother, Father never sent money to Grandmother to help care for Abby. Also, Father admitted that from 2003 until 2011, he did not provide any money for Abby's care.

Because Father's criminal conduct and his lack of contact with Abby while he was not confined eliminated his physical presence from her life, restricted any emotional connection that could have been made with her, and deprived her of parental care and protection, we conclude, based on our review of the entire record, that the evidence is legally and factually sufficient to support the trial court's finding that he knowingly engaged in conduct that endangered her physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(E); *S.L.-E.A.*, 2013 WL 1149512, at *8–9; *M.R.*, 243 S.W.3d at 819; *see also In re S.M.L.*, 171 S.W.3d 472, 479 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("When parents are incarcerated, they are absent from the child's daily life and are unable to provide support, and when parents . . . repeatedly commit criminal acts that subject them to the possibility of incarceration, that can negatively impact a child's living environment and emotional well-being."); *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied) ("An environment which routinely subjects a child to the probability that she will be left alone because her parents are once again jailed . . . endangers both the physical and emotional well-being of a child."). We overrule Father's first issue. Moreover, because only one of the acts or omissions listed in subsection (1) of section 161.001 needs to be established, we do not address Father's second issue,

14

complaining of the sufficiency of the evidence to support termination under section 161.001(1)(F).  *See* Tex. R. App. P. 47.1; *M.R.*, 243 S.W.3d at 819 n.7.

**Best interest**

In Father's third issue, he argues that the evidence is factually insufficient to show that termination is in Abby's best interest.  There is a strong presumption that keeping a child with a parent is in the child's best interest.  *In re M.R.J.M.*, 280 S.W.3d 494, 506 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g) (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006)).  Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest.  Tex. Fam. Code Ann. § 263.307(a) (West 2008).

When determining whether involuntary termination is in the best interest of a child, a factfinder may consider the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child by these individuals or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent.  *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

The factors in *Holley* are not exhaustive, and a petitioner need not prove each factor as a condition precedent to parental termination.  *C.H.*, 89 S.W.3d at

15

27 ("The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest . . . ."). On the other hand, paltry evidence relevant to each condition does not adequately support a jury's finding that termination is in the best interest of the children. *Id.* Furthermore, although proof of an act or omission required under section 161.001(1) does not relieve the burden of establishing best interest under section 161.001(2), the same evidence may be probative of both issues. *Id.* at 28.

In addition to Father's extensive criminal activity that we detailed above, Father testified that he had committed drug-related crimes in the past, including selling cocaine, and that he had used illegal substances. Although Father testified that he had not used drugs since 2003, the trial court received evidence that in 2010, he was convicted of possessing marijuana while he was confined. Thus, the trial court could have reasonably disregarded any implication that Father had ended his involvement with illegal drugs. Cheryl Culberson, a licensed professional counselor, testified that a parent's use of drugs endangers a child because it affects the parent's judgment and functionality.

Father's criminal activity in March 2012, after learning of the Department's case against him, caused consequences beyond his incarceration. Mother spoke with Father by telephone shortly before the termination trial, and during that conversation, he told her that he had been in a car accident that had rendered him "physically unable to do anything." Evidence in the record

16

indicates that Father sustained his injury while he and a partner were robbing a taxi driver. Either Father or his partner was brandishing and using a shotgun when the driver lost control of his car and crashed, pinning Father inside the car. From injuries that he sustained in that accident, Father had been in a hospital from March 2012 until a few days before he testified in January 2013, when he was moved to a jail facility.[11] On the date of the trial, Father was confined to a wheelchair, but he testified that his legs were "coming back" through time and rehabilitation. Regarding his history of making bad decisions, Father testified,

> I mean, everybody makes mistakes. Everybody makes mistakes. You know, I made mistakes. I made mistakes my whole life, and I'm paying for them. You know, when this is over, I plan on staying at home. I plan on being a barber and going to school. I want to take care of my kid, and I want my daughter. I've always wanted my daughter. You know, I just want -- I just want to be given a chance to take care of her.

Anitra Johnson, the CPS caseworker assigned to Abby's case, first spoke with Father in January 2012, when he was in a drug treatment facility in New York. Father told Johnson that he was in the facility as a term of his parole, and Johnson told Father that it was important for him to follow the rules of his parole. However, as explained above, Father pled guilty to committing another crime after speaking with Johnson. From January 2012 through the trial in December

---

[11]As a result of the events leading to his injury, Father pled guilty to attempted reckless endangerment. At the time of the termination trial, Father was seeking to withdraw his plea for that offense. On appeal in this case, Father recognizes that he "engage[d] in a criminal offense in March 2012, which led to his incarceration."

2012, Johnson had no further contact with Father; when she called the treatment facility, she was told that he was "possibly incarcerated." Johnson asked the trial court to terminate Father's parental rights to Abby because he had endangered her emotional well-being by being absent from her life as a result of his criminal conduct.

Father opined that it was in Abby's best interest for his rights to not be terminated because "[e]very girl needs a daddy." The trial court considered a written declaration by Father in which he stated, among other facts, that he was sorry for being confined during Abby's life, that he had spoken to Mother on the phone "every Sunday" from 2004 through 2009, that his mother had sent things to Mother to help with Abby's care, and that he had been in inpatient drug treatment although he did not have a drug problem. Father testified that his mother bought presents for Abby near holidays and that his mother saw Abby once in 2008.

Father testified that from 2004 through 2012, apparently excluding the time he was confined, he held a steady job in the construction industry. But the evidence reveals that Father never used any income to support Abby.

At the time of the termination trial, Abby was still living with Mother's parents. When Abby began living with them in June 2011, she was struggling educationally. By the time of the trial in December 2012, however, she had been making "very good progress" on her schooling. According to Grandmother, Abby, who was eight years old at the time of the trial, had expressed that she

18

enjoyed knowing that she was in a safe and stable environment. Father recognized in the trial court that it was a blessing that Abby was residing with Grandmother; he conceded that Grandmother cared about Abby, was keeping her safe, and was taking good care of her. Father concedes on appeal that Grandmother is capable of caring for Abby and that he cannot presently care for her.

Based on our review of the entire record, we hold that factually sufficient evidence supports the trial court's finding that termination is in Abby's best interest. *See* Tex. Fam. Code Ann. § 161.001(2). Although Father testified that he desired to become involved in Abby's life and expressed regret about mistakes that had led to his absence from her, the trial court could have formed a firm belief or conviction that termination is in Abby's best interest based on Father's lengthy history of committing crimes, including drug-related offenses and a violent offense after knowing that his parental relationship with Abby was in jeopardy; his failure to maintain significant contact (or any physical contact) with her in the first eight years of her life; his failure to financially support her or to show that he could provide stability to her; his lack of any emotional bond with her; and the contrasting stability and proper care that Grandmother was providing. *See Holley*, 544 S.W.2d at 371–72; *In re C.D.S.*, No. 02-11-00516-CV, 2012 WL 2135592, at *3 (Tex. App.—Fort Worth June 14, 2012, no pet.) (mem. op.) (stating that a child's lack of a bond with a parent may affect the child's best interest in terminating the parent's rights); *In re J.N.H.*, No. 02-11-

19

00075-CV, 2011 WL 5607614, at *8 (Tex. App.—Fort Worth Nov. 17, 2011, no pet.) (mem. op.) (considering a parent's criminal and drug histories in affirming a trial court's decision that termination was in the best interest of a child); *In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (noting that "[s]tability and permanence are paramount in the upbringing of a child" and affirming a finding that termination was in a child's best interest when the child was improving in foster care); *In re K.W.*, No. 02-07-00458-CV, 2008 WL 2639037, at *4 (Tex. App.—Fort Worth July 3, 2008, no pet.) (mem. op.) (holding that clear and convincing evidence existed that termination of a father's parental rights was in a child's best interest when, among other factors, the father had a pattern of criminal conduct and drug abuse). We overrule Father's third issue.

## Conclusion

Having overruled Father's dispositive issues, we affirm the trial court's judgment.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; MCCOY and MEIER, JJ.

DELIVERED:  October 24, 2013

20