

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-08-275-CV

IN THE INTEREST OF
M.M. and J.M., CHILDREN

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Appellants J.M. (Father) and S.P. (Mother) appeal from the termination of their parental rights to children M.M. and J.M. Because we hold that the evidence is legally and factually sufficient to support the trial court's endangerment findings underlying the termination of Father's rights,[2] factually sufficient to support the trial court's best interest finding underlying the termination of Father's rights,[3] and legally and factually sufficient to support the

------------

[1] *See* Tex. R. App. P. 47.4.

[2] *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E) (Vernon 2008).

[3] *See id.* § 161.001(2).

trial court's best interest finding underlying the termination of Mother's rights,[4] we affirm the trial court's judgment.

The following evidence was admitted at trial. In the early afternoon of December 9, 2006, after a CPS case had already been pending about fifteen months regarding Mother's older daughter, M.W., CPS investigator Tomika Hardin made an unannounced visit to Mother's home to evaluate it for M.W.'s possible return from foster care. Because M.W. had had a serious bacterial infection that Mother had failed to properly take care of, some of M.W.'s fingers and parts of her legs had had to be amputated. She needed a sterile, clean environment because of her special needs.

When Hardin arrived at the home, the front door was open. Mother was in her pajamas and M.M., about two years old at the time, came to the door naked. Mother explained that she was potty-training M.M. Hardin saw J.M., about three to four months old at the time, asleep on a mattress on the floor with a bottle propped up in his mouth. Hardin explained to Mother that it was not safe or healthy to prop a bottle in the baby's mouth, and Mother stated that she did not normally do so and took the bottle out of his mouth.

---

[4] *See id.*

Hardin observed that the floor had many stains on it. In the living room, she found a bowl with pizza in it; in the kitchen, she saw a roach infestation and pizza boxes. She saw fist-sized holes in the walls, trash on the floors, food and junk in the baby crib, a dark black ring in the bathtub, and piles of trash on the patio. Based on the conditions she found, Hardin reported the situation to CPS to investigate, and the plan for M.W. changed from family reunification to termination. At that point in time, Mother had not completed the services CPS had asked her to complete in M.W.'s case. Mother's parental rights to M.W. were ultimately terminated based on subsections (D) and (E) of section 161.001 of the family code.[5]

The day after Hardin's visit, CPS investigator Sandy Balderas and a co-worker visited the home in response to Hardin's referral. Upon entering the home, Balderas smelled a strong odor of marijuana and saw some marijuana on top of the television set. Mother, dressed in her pajamas and sporting heavy eyes, admitted that she had smoked marijuana about two hours before the visit and also stated that she smoked marijuana twice a day.

---

[5] *See id.* § 161.001(1)(D), (E); *see also In re M.W.*, No. 02-07-00077-CV, 2008 WL 624030, at *7 (Tex. App.—Fort Worth Mar. 6. 2008, no pet.) (affirming termination).

M.M. was again naked; Mother again said that she was potty-training M.M. J.M. was lying on the couch with a bottle propped over his mouth. Balderas saw no injuries on the children but observed that they were unkempt.

In the kitchen, flies buzzed around a pot of spaghetti on the stove, and Balderas also saw empty pizza boxes and roaches. Bare mattresses and clothes lay on the bedroom floors. Balderas saw fist-sized holes in the walls and trash throughout the house, and the back porch was full of trash.

Father showed up during Balderas's visit and started taking the trash to the dumpster. He indicated that he and Mother were separated but trying to "work things out" and that he stayed in the home on weekends. He admitted that he knew of Mother's marijuana use; he denied any drug use on his part but stated that he drank alcohol on weekends.

Concerned about the safety of the home and Mother's ability to take care of the children due to her marijuana use, Balderas placed the children on that same day with their paternal grandmother. Balderas explained to the parents that while the children were staying with a relative, CPS would offer the parents services to reduce the identified risks to the children. The parents would be allowed contact with the children, but it would need to be supervised by the relative who had possession of them. The parents indicated that they understood, agreed, and were willing to "work[] the services," which included

4

obtaining and maintaining stable housing and employment and completing parenting classes, counseling, and psychological evaluations.

Meanwhile, after the placement with their paternal grandmother fell through, M.M. and J.M. were placed with an aunt and then a family friend. The family friend relinquished custody. After he notified CPS, Tomika Hardin found the children in a home with many people, including Mother, and no supervision, despite the agreement that the parents were to be supervised. CPS removed the children from that home because Mother did not follow the safety plan. Father admitted to Hardin in a telephone call after the removal that he knew that he and Mother were violating the safety plan by allowing his sister to babysit the children and allowing Mother to be with the children without supervision.

For the first few months after CPS's intervention regarding M.M. and J.M., Mother and Father were sluggish in completing their services. Mother started drug treatment and completed CATS classes but did not get a stable job or stable housing or complete parenting classes or individual counseling.

Finally, in July 2007, five months after her rights to M.W. were terminated, Mother began parenting classes, which she completed in August. Mother attended one or two sessions of individual counseling through Positive Influences from October to December 2007 but was discharged for lack of

5

attendance. Mother told Hardin that she lost two jobs from the time the children were removed until October 2007 at least partially because she was trying to complete services.

Mother began working at Lisa's Chicken in December 2007, still worked there at trial, and completed most of her services while so employed. Mother restarted individual counseling in March 2008.

Father blamed Mother for the children's removal from the home, denying any responsibility. From the time of the removal until March 2007, he would not take a drug test and did not complete any services. He attended one session of individual counseling (after missing two prior opportunities) in December 2007 at the Metropolitan Center for Counseling but did not attend anger management classes set up at the same location and during the same period.

In December 2007, Father changed jobs. The reason he gave was to work services. He restarted individual counseling in March 2008. He finally began parenting classes on April 17, 2008 and completed them on May 7, 2008. He never completed anger management classes.

At trial, Hardin explained that even though she still had some concerns about the parents' continued drug use and their ability to keep a clean home, she sought and obtained an extension beyond the one-year deadline (December

6

2007) because at the time of the one-year deadline, the parents finally seemed serious about wanting to regain custody of their children. She had several meetings with them in which she emphasized what they needed to do to regain custody, and the parents indicated that they understood what she was saying and were willing to do whatever it took to get their children back. But ultimately, the parents did not aggressively pursue completing the services until the last couple of months before trial. The parents' delay in completing various services until close to the trial date concerned Hardin because it indicated that the children were a low priority to the parents.

At the time of trial, the parents had not successfully completed all the services. They had not demonstrated stable housing; Mother had lived in at least six places from the first removal. Hardin visited the home Mother and Father lived in less than two weeks before trial. A dead roach was in the freezer, chemicals were in a location that would be accessible to young children, and trash and junk were outside the home. Additionally, as a one-bedroom home, it did not appear to have adequate living space for the parents and children.

On May 30, four days before trial, Father and Mother completed a drug assessment but refused to take a random drug test, even though Dr. Williams, the psychologist who counseled them, told them that a refusal would be

7

considered a positive drug test. Hardin, who was also present, testified that Father's refusal was extremely emotional. Both parents had also refused a drug test in the past, but every test that they had actually taken had been negative.

Additionally, on the second day of trial, Father was in jail in connection with an August 2007 incident in which he had been arrested for assaulting his brother; Father refused to attend the termination trial that day.

Dr. Williams testified that Father needs to work on anger issues and on being responsible. Dr. Williams also had concerns about Father's drinking. Dr. Williams smelled alcohol on Father's breath on May 13, less than three weeks before trial. Father at first denied drinking but later admitted it. Dr. Williams recommended that Father have more substance abuse counseling before the children could be returned to his care.

Regarding Mother's psychological status, Dr. Williams reported that she admitted to past use of marijuana and "other products" and that she acknowledged that the children were taken from her at least partially because of her drug use, but she denied any drug use since her children were removed. Dr. Williams testified that it would be difficult for Mother to safely parent without restraints, guidelines, therapeutic intervention, or more counseling.

Dr. Ildiko Balla, also a licensed psychologist, performed psychological evaluations of the couple. They missed the first three scheduled appointments

and arrived too late for the fourth appointment. Dr. Balla stated that Father was guarded and defensive and had difficulty facing painful feelings. Dr. Balla diagnosed Father with an Axis I adjustment disorder, anxiety, depression, and cannabis dependence based on Father's self-reporting of his past use of marijuana (Father told Dr. Balla that he stopped using marijuana in January 2006). Dr. Balla opined that Father needs to deal with his anger issues, stay clean, complete anger management classes, and continue counseling.

Mother told Dr. Balla that she had used marijuana since she was thirteen years old but had stopped when the children were removed in December 2006. She also talked to Dr. Balla about M.W.'s case. She told Dr. Balla that M.W. got sick with bacteria and that after long-term hospitalization, M.W. missed follow-up appointments. Mother told Dr. Balla that M.W. still lagged behind other children and that her fingers had been amputated. According to Dr. Balla, Mother was defensive and did not accept any responsibility for M.W.'s condition. Mother also reported that she did not bond with baby J.M. before his removal.

Dr. Balla opined that Mother was in complete denial about her issues. Her diagnosis included an anxiety disorder, an adjustment disorder with depressed mood, cannabis dependence, and a learning disorder. Dr. Balla recommended

AA, substance abuse treatment, medicine, family counseling, filio therapy, play therapy, and parenting classes.

Of at least fifty-eight opportunities to visit with the children, Mother had thirty-six visits; Father visited the children fifteen times out of fifty-eight opportunities. Mother testified that she had to cancel seven to ten visits because of transportation issues but that she believed that CPS had cancelled even more than that. She testified that she thought her counseling and parenting classes had helped her and that she was willing to do more counseling and had told Dr. Williams so. She testified that she was going to AA meetings and keeping in touch with her sponsors. Mother explained that she did not take the Friday, May 30, 2008 drug test because she was worried about transportation home and that Father did not take the test because he needed to pick up his paycheck to pay rent on Sunday, the day before trial began. She also explained that furniture had now been delivered to the house where she and Father were living, that the old furniture and junk from outside the home had been picked up, and that the refrigerator now contained food for the children.

Mother stated that she believed that she was a good mother and stable and that she loves her children. She was on a waiting list for subsidized child care, would be able to obtain food stamps, and worked thirty hours per week

for $7.50 per hour. She did not appear to believe that continuing her education or obtaining a GED would be that beneficial to the family because she was already working.

Mother admitted that she last smoked marijuana on December 19, 2007, more than a year after the children's removal, and that she did not aggressively pursue completing her safety plan even though she was concerned that the children were being abused in foster care. Additionally, regarding J.M., she testified that four and a half months is not long enough for a child to bond.

Hardin testified that even after Mother was made aware of M.M.'s severe dental problems (M.M. had to have oral surgery performed on ten of her teeth while she was in foster care) and was repeatedly told not to bring junk food to the visits, Mother continued to bring such food to visits for more than a year, stopping only in April 2008, two months before trial. In one visit, Hardin told Mother not to give the children doughnuts because of M.M.'s dental problems and J.M.'s stomach problems. Hardin left the visitation room and peeked back in later. When she did, she saw that M.M. now had a lollipop. This behavior was concerning to Hardin because of Mother's medical neglect of M.W. when she had a bacterial infection and because the behavior demonstrated that Mother's perception of her role and responsibility with the children had not changed. Overall, after almost three years of CPS involvement, Hardin testified,

11

the parents exhibited no durable change in behavior. They exhibited a lack of consistency, a lack of stability, a lack of concern for the children, and a lack of honesty.

Marti Riedel, a licensed professional counselor, testified about M.M. Riedel stated that M.M. is extremely bright, extremely strong-willed, and a dominant individual. Riedel opined that M.M. needs stability, a very strict structure, and bright, motivated parents to challenge her.

M.M. began therapy when she was almost three years old. Her foster parents reported that she had extreme tantrums, was not sleeping or eating well, had difficulty potty-training, wet herself day and night, and destroyed property. (Mother testified that M.M. did not begin acting out until she was placed in foster care and that the children were abused in foster care.) Riedel testified that she noticed that M.M. had a great deal of anxiety regarding relationships and family issues, including, initially, her sister's amputated fingers. One of the matters about which the little girl was anxious was having two sets of parents. The counselor testified that this anxiety increased as the trial date approached. She also testified that M.M., who improved over time, regressed after visits with Mother and Father.

The foster mother testified that M.M. and J.M. had lived with her for ten months (since August 2007), that at first, M.M. stuttered, had temper tantrums

12

and screaming fits, banged on the walls, slept poorly, had potty-training issues, and bossed J.M. According to the foster mother, the behaviors subsided after eight to twelve weeks, but after visits with her parents, M.M. would become aggressive, start biting and hitting, throw fits and get upset, and have "potty" accidents.

According to the foster mother, M.M. did not notice when a visit with her parents did not occur but was happy to go on visits. The foster mother also testified, however, that M.M. told a friend that she "only ha[d] about two more visits left and then [she would not] have to go anymore." The foster mother believed that M.M. might have misinterpreted something that she heard another foster child say.

J.M. was just over a year old when he came to the foster home. The foster mother testified that at first, he was not very interactive, and he cried a lot and wanted to be held, but he would also just sit without playing and was delayed in speech. Early Childhood Intervention (ECI) worked with him about six months, but at the time of trial, according to the foster mother, J.M. was energetic, active, happy, and normal with no delays.

Overall, the foster mother testified that M.M. and J.M. were thriving and progressing in her home, that her home was structured and consistent, that she

13

loves the children, that they are bonded and attached to her, and that she and her husband would like to adopt them.

Father did not testify.

After hearing all the evidence, the trial court terminated the parents' parental rights to M.M. and J.M. The termination decree contains the following findings regarding Mother:

8.1. The Court finds by clear and convincing evidence that [Mother] has

8.1.1. knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

8.1.2. engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

8.1.4. had her parent-child relationship terminated with respect to another child based on a finding that the mother's conduct was in violation of § 161.001(1)(D) or (E), Texas Family Code . . . ;

8.1.5. constructively abandoned the children who have been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services or an authorized agency for not less than six months and: (1) the Department or authorized agency has made reasonable efforts to return the children to the mother; (2) the mother has not regularly visited or maintained significant contact with the children;

14

and (3) the mother has demonstrated an inability to provide the children with a safe environment.

Mother does not challenge these findings. The trial court also found that the termination of Mother's parental rights would be in the children's best interest.

In her sole issue, Mother contends that the evidence is legally and factually insufficient to support the trial court's finding that the termination of her parental rights would be in the children's best interest. Applying the appropriate standard of review,[6] we hold that, based upon our review of the record, the evidence is legally sufficient to support the best interest finding. We also hold, applying the appropriate standard of review,[7] that the evidence is factually sufficient to support the best interest finding.[8] We overrule Mother's sole issue.

The termination decree contains the following findings regarding Father:

---

[6] *See* Tex. Fam. Code Ann. § 263.307(a), (b) (Vernon 2008); *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re J.P.B.*, 180 S.W.3d 570, 573–74(Tex. 2005); *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

[7] *See* Tex. Fam. Code Ann. § 263.307(a), (b); *R.R.*, 209 S.W.3d at 116; *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002); *Holley*, 544 S.W.2d at 371–72.

[8] *See In re M.R.*, 243 S.W.3d 807, 821–22 (Tex. App.—Fort Worth 2007, no pet.) ("[F]orfeiture of . . . parental rights to other children and . . . inability to follow court orders, avoid drug use, and maintain a stable lifestyle supports the conclusion that termination is in the children's best interest.").

15

10.1.    The Court finds by clear and convincing evidence that, after having waived service of process or being served with citation in this suit, [Father] did not respond by filing an admission of paternity or by filing a counterclaim for paternity or for voluntary paternity to be adjudicated under chapter 160 of the Texas Family Code before the final hearing in this suit.

10.3.    The Court finds by clear and convincing evidence that [Father] has

10.3.1.    knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the emotional or physical well-being of the child; and

10.3.2.    engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

10.3.3.    constructively abandoned the children who have been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services or an authorized agency for not less than six months and: (1) the Department or authorized agency has made reasonable efforts to return the children to the father; (2) the father has not regularly visited or maintained significant contact with the children; and (3) the father has demonstrated an inability to provide the children with a safe environment.[9]

The trial court also found that the termination of Father's parental rights would be in the children's best interest.

---

[9] *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (N).

16

In four issues, Father challenges the legal and factual sufficiency of the findings under subsections (D), (E), and (N) and the factual sufficiency of the best interest finding and contends that the trial court erred to the extent that the trial court terminated his rights for failure to file a counterclaim for paternity under section 161.002(b)(1). As we have explained in a similar case,

> Endangerment means to expose to loss or injury, to jeopardize. The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child. Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child.

> . . . . Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.

> To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, and the child is not required to suffer injury. The specific danger to the child's well-being may be inferred from parental misconduct alone, and to determine whether termination is necessary, courts may look to parental conduct both before and after the child's birth. . . . A parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, supports a finding that the parent engaged in conduct that

17

endangered the child's physical or emotional well-being. Thus, parental and caregiver illegal drug use supports the conclusion that the children's surroundings endanger their physical or emotional well-being. A factfinder may also reasonably infer from a parent's failure to attend scheduled drug screenings that the parent was avoiding testing because the parent was using drugs. As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being.

Because the evidence pertaining to subsections 161.001(1)(D) and (E) is interrelated, we conduct a consolidated review.[10]

The evidence at trial demonstrated that Father knew about Mother's drug use and knew about the conditions in which the children were living while in the parents' care but did nothing to improve them. Accordingly, applying the appropriate standard of review,[11] we hold that, based upon our review of the record, the evidence is legally sufficient to support the trial court's endangerment findings regarding Father under subsections (D) and (E).

Also applying the appropriate standard of review,[12] we hold that the evidence is factually sufficient to support those findings. We overrule Father's

---

[10] *In re J.W.*, No. 02-08-00211-CV, 2009 WL 806865, at *4–5 (Tex. App.—Fort Worth Mar. 26, 2009, no pet.) (mem. op.) (citations omitted).

[11] *See J.P.B.*, 180 S.W.3d at 573–74.

[12] *See H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 28.

first issue, and, in light of this disposition, do not reach his second and third issues.[13]

In his fourth issue, Father contends that the evidence supporting the best interest finding is factually insufficient. Applying the appropriate standard of review,[14] we hold that, based on our review of the record, the evidence is factually sufficient to support that finding. We therefore overrule Father's fourth issue.

Having overruled the parents' dispositive issues, we affirm the trial court's judgment terminating their parental rights.

PER CURIAM

PANEL:  DAUPHINOT, GARDNER, and WALKER, JJ.

DELIVERED:  July 23, 2009

---

[13] *See* Tex. R. App. P. 47.1; *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.) (providing that along with a best interest finding, a finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination).

[14] *See* Tex. Fam. Code Ann. § 263.307(a), (b); *R.R.*, 209 S.W.3d at 116; *H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 28; *Holley*, 544 S.W.2d at 371–72.

19