NO. 07-09-0101-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

DECEMBER 1, 2009

_____

IN THE INTEREST OF D.D.D.K., C.E.K., JR. AND C.E.K., CHILDREN

_____

FROM THE 320TH DISTRICT COURT OF POTTER COUNTY;

NO. 74491-D; HONORABLE DON EMERSON, JUDGE

_____

Before CAMPBELL and HANCOCK and PIRTLE, JJ.

**MEMORANDUM OPINON**

Appellants, Charles and Nancy, appeal from a final order terminating their parental

rights to their three minor children, D.D.D.K., C.E.K., Jr., and C.E.K.[1]  They assert: (1) the

trial court abused its discretion by admitting hearsay statements of sexual abuse;[2] and (2)

_____

[1]To protect the privacy of the parties in this case, we identify the children by their initials, the mother by the pseudonym "Nancy," and the father by the pseudonym "Charles."  *See* Tex. Fam. Code Ann. § 109.002(d) (Vernon 2002); Tex. R. App. P. 9.8(b)(1).

[2]Only Charles asserts this point of error.

the evidence is legally and factually insufficient to support the trial court's findings that: (a) Appellants knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children; (b) Appellants engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children; and (c) termination of the parent-child relationship is in the children's best interest. We affirm.

## Background

Nancy and Charles were married in November 1999. They had three children: D.D.D.K., C.E.K., Jr., and C.E.K.[3] On July 25, 2007, the Department of Family and Protective Services ("the Department") filed an original petition for termination of their parental rights pursuant to section 161.001(1)(D) and (E) of the Texas Family Code.[4] The following evidence was adduced during the final termination hearing held December 9, 2008, and January 13, 2009.

In 2005, Charles and Nancy had been separated for a year. Nancy was living in Dallas. Charles was living with his mother while his children were staying with his grandmother. Charles's brother, Glen, also stayed at his grandmother's house.

---

[3]D.D.D.K and C.E.K. are females and C.E.K., Jr. is male. At the time of trial, D.D.D.K., C.E.K., Jr. and C.E.K. were nine, seven, and six years of age, respectively.

[4]For convenience, future citation to provisions of the Texas Family Code will be simply "section __" or "§ __." Likewise, future citation to these subsections of the Family Code will be simply "subsection(D)" and/or "(E)."

2

When Charles returned from serving two weeks in jail for overdue traffic tickets, his children accused Glen of molesting them. Charles reported the molestation and took the children to The Bridge–Children's Advocacy Center in Amarillo. Becky O'Neal, registered nurse and sexual assault nurse examiner, performed a SANE examination on each child. During the examination, she thought it unusual that each child assumed the knee-chest position with their head on the table and buttocks stuck up in the air without any guidance. She further testified all three children had immediate dilation of the anus which indicated their anus was being opened frequently to allow something to be inserted. O'Neal believed the children had been sexually assaulted multiple times.[5] Charles subsequently took the children to stay at the Salvation Army. Nancy returned to Amarillo and reunited with Charles.

In Fall 2006, Charles was laid off from his job. Nancy was using a substantial amount of cocaine. Although Charles found temporary work, he quit in order to care for the children because Nancy was unable. Later, he exhausted his unemployment compensation and the family was living from motel to motel. Neither parent worked and both parents were using drugs. Their only source of income was money Nancy received from her relatives.

In May 2007, the family moved to the Ritz Motel and were staying in a single room with two king-size beds. On July 23, Charles and Nancy smoked crack cocaine in their

---

[5]Glen was later charged and convicted of molesting the children.

3

bathroom while the children were asleep. Nancy then watched television and Charles went to bed. Before 4:00 a.m., Charles left the motel room to get something to eat at a nearby restaurant. Shortly thereafter, Nancy left the room to smoke a cigarette. As they left, both parents noticed the tenants across the hall were awake, had their door open, and noticed them leaving. Furthermore, both parents knew the persons staying across the hall were drug users because they would sometimes pool their money in order for Charles to purchase drugs for them.

When Nancy returned ten to fifteen minutes later, C.E.K. was jumping up and down—whining. C.E.K. said someone had touched her and pointed to the room across the hall. Nancy waited for Charles to return approximately twenty minutes later. Charles looked at C.E.K. and knew something was not right. He suspected a homeless person who stayed across the hall with the couple living there. He confronted them and they denied being in Charles's room. Charles then readied the children for school and took them to a fast-food restaurant to eat breakfast. After dropping D.D.D.K. and C.E.K., Jr. at school, he returned to the motel and packed their belongings. He also gathered bed linens that might contain evidence of the sexual assault and drove to Walmart where he purchased q-tips and swabbed C.E.K. in the parking lot. He then drove C.E.K. to the hospital arriving at 10:30 a.m. Nancy accompanied them throughout but was asleep most of the time.

4

After initially examining C.E.K., the other two children were brought in for a sexual assault examination. Nurse O'Neal examined all three children. According to O'Neal's testimony, C.E.K. had an acute tear to the hymen and an abrasion with redness on the face of the hymen. D.D.D.K. had an abrasion at the base of the hymen. She classified the girls' trauma as acute occurring within the last seventy-two to ninety hours. She opined the trauma was caused by penetration of their sexual organs. She also determined all three children had immediate dilation of their anuses; and, in her opinion, had been sexually assaulted on more than one occasion. She further opined that the dilation was not the result of the prior assaults in 2005 because their sphincter tone would have returned if there had been no penetration since that time.

Kari Neeley, an investigator for Child Protective Services, interviewed Nancy and Charles. Due to their behavior, Neeley suspected they were on drugs. She asked each of them to take a drug test. Initially, they refused but Neeley eventually convinced them to permit her to take a hair sample for analysis. Samples were also taken from the three children. All the samples, including those from the children, tested positive for cocaine. C.E.K., Jr.'s sample also showed the presence of methamphetamine.

Following the hospital visit, the children were placed in foster care and counseled by Sarah Lynn Jennings, a therapist and counselor. At the time, C.E.K. was four years, nine months old but functioning as a three year, one month old. Jennings met with C.E.K. for forty counseling sessions and D.D.D.K. for thirty sessions.

During the sessions, both girls confided in Jennings that they had been sexually abused at the motel multiple times by strange men while their parents were in the same room. C.E.K. indicated the activity occurred when men were giving her parents money. C.E.K. also told Jennings that Charles had touched her twice in the vagina. C.E.K. indicated she did not want to go back to the motel because "it is not safe there–I get hurted there in my privates by the mens."

D.D.D.K. confided she was hurt in the vagina and anus by strange men in the bedroom and shower. She told Jennings that her parents just turned away and talked when the men were doing these things to her. She also described being scared, hiding under the furniture to avoid men, and eating bugs and trash. She was angry and confused that her parents would remain in the room and do nothing while the men were hurting her. C.E.K. and D.D.D.K. told their caseworkers that they were afraid and did not want to return to the motel.

After the children entered foster care, D.D.D.K. and C.E.K. suffered from enuresis. Recently, D.D.D.K. stopped wetting the bed while C.E.K. was still wearing diapers at night. Both children repeatedly stimulated themselves and reportedly humped the bed. D.D.D.K. sexually acted out with a male child on two occasions. C.E.K. threw uncontrollable fits and at times was almost unconsolable. Jennings indicated the children had no bonds with anyone.

Jennings opined that, although D.D.D.K. and C.E.K. indicated they continued to love and miss their parents, both children continued to fear they would not protect them. She opined that, because the abuse occurred in the parents' presence, seeing Charles and Nancy would be detrimental psychologically for the children because the children would likely feel afraid and unsafe in their presence. Accordingly, she recommended the parents not even receive visitation.

Jennings also testified the children were presently in environments where they could safely develop relationships with all their needs met. She recommended the children continue with therapy and believed a loving, therapeutic environment might possibly avoid the necessity of more intensive services. Her understanding from speaking with the children was they did not want to return to Charles and Nancy because of the abuse that occurred in their parents' presence and their failure to protect them. She opined that termination would provide the safety the children needed.

Charles denied ever sexually abusing or prostituting his children. He admitted using drugs and stated that he "could have been a little bit more alert because drugs do dense your senses." He also testified that, when they were at the motel, his wife's drug use affected her ability to care for their children. He further testified he: (1) had been drug-free for a year; (2) was working two jobs; (3) currently attended Alcoholics Anonymous; (4) attended church and received counseling from his pastor who was also his mentor; (5) lived alone in a one-bedroom efficiency apartment; and (6) saved money to afford a larger

7

place for his children to live. On cross-examination, he testified he was uncertain whether C.E.K. had been assaulted in the motel room, could not name his AA sponsor or identify the twelve steps, indicated AA believed he was uncooperative because he would not admit he was an addict, and claimed he was not an addict because he had found Christ. He testified there was "no chance he [would] fall again *as long as* [he] can walk in the spirit of God . . . ."

Nancy testified that, with the exception of the incident with Uncle Glen, she was uncertain whether the children were molested. She testified the last time she used drugs was September 19, 2008, the day of her arrest for possession of cocaine. Prior to her arrest, she filed a false complaint against her husband for assault in order to obtain income tax money to buy drugs, at a time when they owed back rent and their utilities had been turned off. She also testified her drug use did not affect her parenting skills and she did not make bad decisions while she was on drugs.

Her plan to turn the family around was to find a job after she was released from prison, take the classes she failed to complete as required by the service plan, get the family into church, undergo any necessary counseling, change her surroundings and the persons she associated with, and give her life to Christ.

Constance Priest, the children's caseworker, indicated all three children were receiving counseling and their placements were stable. After C.E.K., Jr. recently exhibited

assaultive behavior toward other children and his foster mother, however, he was being transferred to a residential treatment center.

The Department's current plan for the children was unrelated adoption. Priest recommended the children not be returned to Charles and Nancy because two of the three children implicated their parents in sexual abuse and remained relatively unstable nearly a year and a half after coming into foster care due to their exposure to drugs and sexual abuse. Further, although the Department initially sought placement with relatives, there were no relatives willing or interested. D.D.D.K.'s foster parents, however, have expressed an interest in adoption.

Although Priest noted Charles had completed many recommended services,[6] she also testified Charles had not fully cooperated with CPS. She indicated: (1) he failed to contact her regarding a requested drug test, (2) failed to maintain contact in order to avoid scheduling drug screenings between January 2008 and October 2008, and (3) failed to follow recommendations following his psychological examination. When Charles was asked about counseling, he told Priest "[c]ounseling is the work of the devil . . . ."

---

[6]Charles attended a required class on alcoholism and drug abuse, underwent a psychological evaluation, and a sexual abuse education class.

9

At the conclusion of the proceeding, the trial court issued an order terminating

Charles's and Nancy's parental rights. On request, the trial court issued its findings of fact

and conclusions of law.[7]

## Discussion

Charles asserts D.D.D.K's and C.E.K.'s hearsay statements of sexual abuse should

have been excluded because the children's testimony was unreliable. Charles and Nancy

also assert the evidence was legally and factually insufficient to support the trial court's

findings that Appellants knowingly placed or knowingly allowed the children to remain in

---

[7]The findings of fact state, in pertinent part, as follows:

3.    At the time the children were removed, the children and parents were living in a motel room and had been living in hotel rooms and shelters for several months leading up to the removal.

4.    At the time of the removal neither Respondent Charles nor Respondent Nancy were employed and both depended on relatives to provide for their family.

5.    Drug tests performed on D.D.D.K. and C.E.K. on August 3, 2007, returned positive for cocaine.

6.    The drug test performed on C.E.K., Jr., on August 3, 2007, returned positive for methamphetamine and cocaine.

7.    Drug tests performed on Respondents Charles and Nancy taken on July 27, 2007, returned positive for cocaine.

8.    Respondents Charles and Nancy used "crack" cocaine around the children.

9.    Respondents Charles's and Nancy's drug use negatively affected their ability to provide a safe and stable home for their children.

10.    The children the subject of this suit have been sexually assaulted on more than one occasion while Nancy and Charles were present.

11.    The children are in foster care.

12.    The children are participating in counseling.

13.    The children's placements are stable.

14.    The children's needs are being met.

15.    The Department has made a diligent effort to locate relatives of the children who would be willing and able to provide for the children.

10

conditions or surroundings which endangered the physical or emotional well-being of the children, or engaged in conduct or knowingly placed with persons who engaged in conduct which endangered the physical or emotional well-being of the children. Finally, Charles and Nancy assert the trial court erred in its determination that termination of the parent-child relationship was in the children's best interest.

## I.    First Point of Error — Hearsay Statements

The Texas Family Code permits the admission of hearsay statements by child abuse victims in termination-of-parental-rights proceedings. *See* Tex. Fam. Code Ann. § 104.006 (Vernon 2008). Section 104.006 provides that, under certain circumstances, a statement made by a child twelve years of age or younger that describes sexual abuse against a child is admissible. The statute allows admission of such a statement, providing: (1) the court finds the time, content, and circumstances of the statement provide sufficient indicia of the statement's reliability, and (2) the child testifies or is available to testify at the proceeding in the court, or in any manner provided for by law, or the court determines that the use of the statement in lieu of the child's testimony is necessary to protect the welfare of the child.

Whether a trial court erred in admitting hearsay evidence under section 104.006 depends on whether it abused its discretion, *e.g.*, failed to follow controlling rules and principles or the decision to admit the evidence lacked evidentiary support. *In re P.E.W.*, 105 S.W.3d 771, 774 (Tex.App.–Amarillo 2003, no pet.).

11

Charles asserts the trial court abused its discretion in admitting the evidence because D.D.D.K's and C.E.K.'s statements were obtained through the use of leading questions and the result of coaching by their foster parents. He also asserts the statements are unreliable because the children are functioning at less than their age levels and he reported incidents of sexual abuse in 2005 and 2007.

Jennings was qualified as an expert without objection.[8] She has seen D.D.D.K. and C.E.K. in counseling sessions thirty to forty times respectively over a period of months. She testified the children's statements were reliable and accurate because their accounts of sexual abuse were consistent when told on multiple occasions and the children had not seen each other for extended periods of time. Each child was telling the same story and the stories continued to come out over time.

She also testified the children's statements were consistent with what she had learned about the children while counseling them. She testified their accounts of sexual abuse disclosed information related to sex that a child of their age would not normally know. Further, she was not troubled that the statements were inconsistent with other statements following the 2007 incident because it was not uncommon for children who had endured such abuse to open up later when they are less afraid.

---

[8]Jennings is a licensed professional counselor who has been practicing since 2003. In 2007, she was licensed as an LPC Supervisor. She holds a bachelor's in psychology and a master's in professional counseling. She has taken numerous courses over the years on child sexual abuse, its symptoms and effects.

The children's statements were also corroborated by SANE Nurse O'Neal who examined the two girls shortly after they left the motel. She testified both girls suffered from acute trauma to their sexual organs and had immediate dilation of the anus indicating multiple sexual assaults had occurred. That the children were acting out sexually after removal, stimulating themselves and exhibiting predatory behavior also corroborates their testimony. Moreover, there is no evidence of record that either child had a history of telling falsehoods or that either child was motivated to not tell the truth.

Charles asserts the statements were not in the children's "language" and were coached by the foster parents through leading questions.[9] Jennings testified that, in her opinion, the children's statements were not coached and the foster parents had complied with requests on how to follow up on the children's statements with questions that were not leading. It is well established that, in a bench trial, the judge as the trier of fact weighs the evidence, assesses the credibility of witnesses and resolves conflicts and inconsistencies. *Intec Systems, Inc. v. Lowrey,* 230 S.W.3d 913, 920 (Tex.App.—Dallas 2007, no pet. h.). Thus, whether Charles or the children were to be believed was a credibility determination best left to the trier of fact.[10]

[9]Charles also challenges whether the foster parent's motivation to adopt influenced the children's statements. The reliability of a foster parent is not inherently suspect. *In re M.R.*, 243 S.W.3d 807, 814 (Tex.App.–Fort Worth 2007, no pet.). Further, the reliability referred to in section 104.006 is the reliability of the child's declaration, not the witness relaying the child's declaration. *Id.* Where the challenge is to the credibility of the foster parent because of their motivation to adopt, the trier of fact is the judge of credibility. *Id.*

[10]Apparently, the trial court found the children's hearsay statements more credible than either Charles or Nancy's testimony. Paragraph ten of the trial court's findings of fact states that "[t]he children the subject of this suit have been sexually assaulted on more than one occasion while Nancy and Charles were present."

13

Charles next asserts the children's statements are unreliable because they were functioning at less than their age levels. He also asserts their statements that he was present when any sexual abuse occurred is refuted by his testimony that he reported the incidents of sexual abuse in 2005 and 2007. The only evidence creating a nexus between the functionality of the children's age levels and the reliability of their statements is Jennings's expert testimony that the children's statements were accurate and reliable. Next, whether Charles's reporting of the incidents in 2005 and 2007 renders the children's statements unreliable is a question best determined by weighing the evidence. This determination is best made by the trier of fact–in this instance, the trial court; and, apparently, the trial court did not find their testimony unreliable as evidenced by its findings of fact.

"In sum, although the outcry statements were not definite as to time, the specificity of the content and circumstances existing at the time of the outcr[ies] demonstrate the statements' veracity." *In re M.R.*, 243 S.W.3d 807, 815 (Tex.App.–Fort Worth 2007, no pet.). Furthermore, there is evidence of record "touching upon various indicia which courts often use to assess the reliability of a child's outcry." *Id. See also Idaho v. Wright*, 497 U.S. 805, 821, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990); *Norris v. State*, 788 S.W.2d 65, 71 (Tex.App.–Dallas 1990, writ ref'd).

After considering the evidence before the trial court, and the statutory prerequisites under section 104.006, we cannot say the trial court abused its discretion in admitting Jennings's testimony regarding D.D.D.K.'s or C.E.K.'s statements of sexual abuse. Charles's first point of error is overruled.

## II. Legal and Factual Insufficiency

While a parent's rights to his children are of constitutional magnitude; *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003), they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). Due process requires the Department to justify termination of parental rights by clear and convincing evidence. §§ 161.001, 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002).[11] The higher burden of proof in termination cases elevates the appellate standard of both legal and factual sufficiency review. *See In re J.F.C.*, 96 S.W.3d at 264-65; *In re C.H.*, 89 S.W.3d at 25. In conducting a legal sufficiency review in a termination-of-parental-rights proceeding, a court must review all the evidence in the light most favorable to the verdict and determine whether the evidence is such that a fact finder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.F.C.*, 96 S.W.3d at 265-66.

---

[11]Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." § 101.007; *In re J.F.C.*, 96 S.W.3d at 264. While the proof must be more than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979).

In conducting a factual sufficiency review of a finding in a termination-of-parental-rights proceeding, we consider the entire record including evidence supporting and contradicting the finding and determine whether a fact finder could reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof. *Id.*; *In re C.H.*, 89 S.W.3d at 25-26. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266.

## A.    Termination of Parental Rights

In proceedings to terminate the parent-child relationship under section 161.001, the Department must establish one or more of the acts or omissions enumerated under section 161.001(1) of the statute and must also prove that termination is in the best interest of the child. § 161.001; *In re S.M.L.D.,* 150 S.W.3d 754, 756 (Tex.App.–Amarillo 2004, no pet.). However, while both elements must be established; *Tex. Dep't of Human Services v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987), only one finding under section 161.001(1) is necessary to support a judgment of termination. *In re W.E.C.,* 110 S.W.3d 231, 239-40 (Tex.App.–Fort Worth 2003, no pet.).

Here, the trial court found that Charles and Nancy had knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children and that they also engaged in conduct

16

or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being. *See* § 161.001(1)(D), (E). Both subsections (D) and (E) require proof of endangerment, which means to expose to loss or injury, or to jeopardize a child's emotional or physical health. *Boyd,* 727 S.W.2d at 533. While endangerment means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child suffer actual physical injury. *In re A.B.*, 125 S.W.3d 769, 776-77 (Tex.App.–Texarkana 2003, pet. denied); *Doyle v. Texas Dep't of Protective and Regulatory Services,* 16 S.W.3d 390, 394 (Tex.App.–El Paso 2000, pet. denied).

Subsections (D) and (E) differ in one respect: the source of the physical or emotional endangerment to the child. Subsection (D) requires a showing that the environment in which the child is placed endangered the child's physical or emotional health, *id.,* whereas, Subsection (E) requires that the cause of the endangerment be the parent's conduct alone, as evidenced not only by the parent's actions but also by the parent's omission or failure to act. *Doyle*, 16 S.W.3d at 395.

The law does not require that the child be a victim of abusive conduct before the Department can involuntarily terminate a parent's rights to the child. *In re C.J.F.,* 134 S.W.3d 343, 350 (Tex.App.–Amarillo 2003, no pet.). "Rather, if the evidence shows a course of conduct which has the effect of endangering the emotional well-being of the child, a finding under section 161.001(1)(E) is supportable." *Id.*

17

**1.    Second Point of Error – Environmental Endangerment**

Conduct of a parent or another person in the home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection (D). *In Interest of W.S.*, 899 S.W.2d 772, 776 (Tex.App.–Fort Worth 1995, no writ). Parental knowledge that actual endangering conduct has occurred is not necessary; it is sufficient that the parent was aware of the potential for danger and disregarded the risk. *In re S.M.L.,* 171 S.W.3d 472, 477 (Tex.App.–Houston [14th Dist.] 2005, no pet.); *In re S.G.S.,* 130 S.W.3d 223, 238 (Tex.App.–Beaumont 2004, no pet.); *In re A.B.,* 125 S.W.3d at 775. Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his or her home represents a part of the "conditions or surroundings" of the child's home under subsection (D). *In Interest of M.R.J.M.*, 280 S.W.3d 494, 502 (Tex.App.–Fort Worth 2009, no pet.). The child is not required to suffer injury and the parent's conduct need not be directed at the child. *In re M.C.T.*, 250 S.W.3d 161, 169 (Tex.App.–Fort Worth 2008, no pet.).

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *In re R.W.*, 129 S.W.3d 732, 739 (Tex.App.–Fort Worth 2004, pet. ref'd). Without question, sexual abuse is conduct that endangers a child's physical or emotional well-being. *In re L.C.*, 145 S.W.3d 790, 796 (Tex.App.–Texarkana 2004, no pet.). Moreover, "evidence of sexual abuse of one child

18

is sufficient to support a finding of endangerment with respect to other children." *In re R.W.,* 129 S.W.3d at 742. Thus, D.D.D.K.'s and C.E.K's outcries of repeated sexual abuse at the motel by the strange men in the presence of their parents established surroundings which endangered the children[12] including C.E.K., Jr.[13]

Furthermore, the record shows endangering conditions other than those relating to sexual abuse. A parent's drug use and its effect on a parent's life and his or her ability to parent may also establish an unstable home environment for a child. *In re Z.C.,* 280 S.W.3d 470, 474 (Tex.App.–Fort Worth 2009, pet. denied); *Vasquez v. Texas Dep't of Protective & Regulatory Servs.,* 190 S.W.3d 189, 196 (Tex.App.–Houston [1st Dist.] 2005, pet. denied). The endangerment to these children is no where more self-evident than their positive drug tests taken shortly after leaving the motel. In addition, Charles testified the drugs he used at the motel dulled his senses and affected Nancy's ability to care for the children.

---

[12]Charles and Nancy contend that the hearsay testimony of the children alone cannot meet the standard of clear and convincing evidence. The intermediate standard of clear and convincing evidence falls between the preponderance of the evidence standard of ordinary civil proceedings and the reasonable doubt standard utilized in criminal proceedings. *In re E.M.E.,* 234 S.W.3d 71, 73 (Tex.App.–El Paso 2007, no pet.). In criminal cases, where the victim is seventeen years of age or younger, the uncorroborated testimony of the victim alone is sufficient to support a conviction for sexual assault. Tex. Code Crim. Proc. Ann. art. 38.97(a), (b)(1) (Vernon 2005). *See Empty v. State,* 972 S.W.2d 194, 196 (Tex.App.–Dallas 1998, pet. ref'd); *Karnes v. State,* 873 S.W.2d 92, 96 (Tex.App.–Dallas 1994, no pet.). A child victim's outcry statement alone can also be sufficient to support a conviction for sexual assault. *Kimberlin v. State,* 877 S.W.2d 828, 831 (Tex.App.–Fort Worth 1994, pet. ref'd) (citing *Rodriguez v. State,* 819 S.W.2d 871, 873 (Tex.Crim.App. 1991).

[13]Although the record did not contain evidence of any outcry by C.E.K., Jr., his SANE examination in 2007, following C.E.K.'s assault, revealed an immediate dilation of the anus indicating he had been sexually assaulted more than once.

Additionally, Charles may have unreasonably delayed taking C.E.K. to the hospital after he learned of the sexual assault. In fact, after learning of the assault, Charles and Nancy delayed nearly six and one-half hours before taking C.E.K. to the hospital. Neither parent called the police and both appeared to be under the influence of a controlled substance at the hospital when interviewed by the CPS investigator. The subsequent drug test confirmed there was cocaine in their system. From this evidence, the fact finder could reasonably form a firm belief that Charles and Nancy delayed reporting the assault to avoid the detection of drugs in the motel room and/or to use drugs between the time they learned of the assault and when they took C.E.K. to the hospital.

Nancy contends there was no evidence that C.E.K.'s assault occurred as a result of her drug use. The Department need not prove Nancy's actions were directed at the children or the children *actually* suffered injury as a result of her conduct. *Boyd*, 727 S.W.2d at 533. The specific danger to the child's well-being may be inferred from the parental misconduct. *Toliver v. Texas Dep't of Family and Protective Service*, 217 S.W.3d 85, 98 (Tex.App.–Houston [1st Dist.] 2005, no pet.). Prior to the incident, Nancy had been watching television for hours[14] when her husband left to get something to eat. She then left her children alone in a motel room at 4:00 a.m. to smoke a cigarette knowing drug users directly across the hall were awake, had their door open, and observed her leaving.[15]

---

[14]An activity Charles testified she often engaged in when she was under the influence of drugs.

[15]Charles also testified that, when he left to get something to eat at approximately 4:00 a.m., the persons across the hall observed him leaving through their open door.

20

Moreover, except to equivocate and profess ignorance, neither Charles nor Nancy offered any rational explanation why, in addition to C.E.K., D.D.D.K. also suffered acute trauma to her sexual organs in the preceding seventy-two to ninety hours and all of the children showed signs of having undergone multiple anal sexual assaults.

Based on the foregoing evidence, we conclude the evidence was sufficiently clear and convincing to support the trial court's finding on this point. Looking at the evidence in a light most favorable to the finding of the trial court, we conclude a reasonable trier of fact could have formed a firm conviction that Charles and Nancy knowingly placed or allowed their children to remain in conditions or surroundings that endangered their physical or emotional well-being. Also, the disputed evidence on the matter is not so significant that the trial court could not have formed a firm belief or conviction that its finding was true. Charles's second point of error and Nancy's first issue are overruled.

### 2. Third Point of Error - Endangerment By Parental Act Or Omission

While we recognize that an affirmative finding by clear and convincing evidence satisfying one of the subsections of section 161.001(1) is sufficient to terminate parental rights, *see In re S.F.*, 32 S.W.3d 318, 320 (Tex.App.–San Antonio 2000, no pet.), in the interest of fairness and certainty, we will address issues under (E) as well. *See In re A.B.*, 125 S.W.3d at 776.

21

A parent's refusal to acknowledge responsibility for the child and protect him or her from a situation that exposes the child to the risk of sexual abuse is grounds for termination of parental rights under subsection (E). *See In re L.C.,* 145 S.W.3d at 797-98; *In re J.M.C.A.,* 31 S.W.3d 692, 697-98 (Tex.App.–Houston [1st Dist.] 2000, no pet.); *Lakes v. Texas Dep't of Human Services,* 791 S.W.2d 214, 216 (Tex.App.–Texarkana 1990, no writ).

Furthermore, drug addiction and its effect on a parent's life and ability to parent may also establish an endangering course of conduct. *Latham v. Department of Family and Protective Services,* 177 S.W.3d 341, 348-49 (Tex.App.–Houston [1st Dist.] 2005, no pet.); *In re S.M.L.D.,* 150 S.W.3d at 758; *In re R.W.,* 129 S.W.3d at 739. This is particularly so where drug use continues even though the parent is aware that his or her parental rights are in jeopardy. *Latham,* 177 S.W.3d at 348. Moreover, although mere imprisonment may not be conduct that endangers the emotional and physical well-being of a child, imprisonment as a result of a detrimental course of conduct endangering the child, such as using illegal drugs, will establish facts sufficient to meet the requirement of subsection (E). *See In re S.M.L.D.,* 150 S.W.3d at 759; *In re S.F.,* 32 S.W.3d 318, 322 (Tex.App.–San Antonio 2000, no pet.).

The record here supports the trial court's conclusion that both Charles and Nancy had notice of sexual abuse to D.D.D.K. and C.E.K. The children testified that, while they were at the motel, strange men engaged in sex acts with them while their parents were in

22

the room and C.E.K. testified the strange men gave their parents money. Further, Charles had been out of work for nearly six months and Nancy was unemployed. Both parents were using drugs and had daily drug habits[16] costing between eighty to a hundred dollars per day for both while their only source of income was money from their families. When the children were examined at the hospital following the assault, they all showed signs of being sexually assaulted more than once. In addition to C.E.K. having recent acute trauma to her sexual organs, D.D.D.K.'s sexual organs also showed similar trauma. Further, neither parent offers any rational explanation for the injuries suffered by their children, equivocate whether they believe the children suffered any sexual abuse at all other than the single episode involving C.E.K. and dismiss D.D.D.K.'s and C.E.K.'s outcries as coached.[17]

After the Department filed suit to terminate Nancy's parental rights, she continued to engage in the course of conduct that had previously endangered her children. That is, she continued using cocaine and only four months prior to the final hearing pled guilty to possession of cocaine and was imprisoned. Moreover, her drug use is directly related to her incarceration and subsequent inability to care for the children. Remarkably, at the final

---

[16]The parents' frequency of drug use was difficult to pin down from their testimony, however, both indicated they used on weekends, and sometimes during the week.

[17]At the very least, the parents' testimony demonstrated a lack of awareness of both the conduct being perpetrated on their children as well as the impact that it had on them. Given the extent of the evidence of sexual abuse to their children in 2007, a fact finder could reasonably form a firm belief that their lack of awareness, if their testimony is to be believed, was due to their drug use.

hearing, Nancy testified she "did not make bad decisions on drugs," "[drugs] really do not have an effect on [her]," and "she does not think she has a drug problem."

Further, the record reflects that Charles was aware of Nancy's drug abuse but did nothing about it. Rather, he also abused drugs. Charles testified he had last used cocaine in January of 2008, almost six months *after* the Department filed suit to terminate his parental rights. To his credit, he is working two jobs, has stayed drug-free for nearly a year, and has cooperated with the Department to the extent that he completed many required services.[18] Nevertheless, despite Charles's testimony that he stopped abusing narcotics and progressed forward, the trial court was entitled to infer, based on evidence that he failed to appreciate the need for treatment, that his substance abuse issues would continue and would further jeopardize the children's well-being. Between January 2008 and October 2008, Charles failed to maintain contact with CPS to schedule drug screenings and did not respond to a specific request for a drug screen. Charles has also exhibited a negative attitude towards counseling–labeling it the "work of the devil." Further, although he professes to attend AA meetings, he has no sponsor, cannot name the twelve steps and doesn't know which step he is on. Perhaps more telling, Charles testified at the termination hearing that he "was really over those steps."

---

[18]Although Charles has completed many of the required services, substantial compliance with a service plan does not prevent termination of parental rights. *In re A.C.B.*, 198 S.W.3d 294, 298 (Tex.App.–Amarillo 2006, no pet.) (collected cases cited therein).

24

Based upon this record, the evidence was sufficiently clear and convincing to support the trial court's findings that the children had been sexually assaulted on more than one occasion while Charles and Nancy were present and their drug use negatively affected their ability to provide a safe and stable home for their children. Viewing the evidence in a light most favorable to the trial court's findings, we conclude a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. Additionally, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is not so significant to prevent it from forming a firm belief or conviction, making the evidence legally and factually sufficient. Charles's third point of error and Nancy's second issue are overruled.

### B.    Best Interest of the Child

A "best interest" finding does not require evidence on any certain set of factors, nor does it limit the factors a fact finder may consider. *Wilson v. State*, 116 S.W.3d 923, 929 (Tex.App.–Dallas 2003, no pet.). We consider the following non-exclusive factors: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) present and future emotional and physical danger to the child; (4) parenting abilities of one seeking custody; (5) available assistance programs to promote the child's best interest; (6) plans for the child by one seeking custody; (7) stability of the home or proposed placement; (8) acts or omissions of a parent indicating the parent-child relationship is improper; (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex.

25

1976).  *See In re A.C.B.,*198 S.W.3d at 298.  The *Holley* factors are not exhaustive, and there is no requirement that the Department prove all factors as a condition precedent to parental termination.  *See In re C.H.*, 89 S.W.3d at 27.  Further, the best interest analysis evaluates the best interest of the child, not that of the parent.  *Holley*, 544 S.W.2d at 372.

Although there is no direct evidence concerning the children's desires, Jennings, their therapist and counselor, testified the children did not want to return to their biological parents because of the abuse that occurred in their parents' presence and their failure to protect them.  Jennings testified the children were fearful of their parents and felt no one could protect them.  She recommended against parental visitation because she believed seeing their parents would be detrimental to the children psychologically.  Accordingly, this factor weighs in favor of termination.

All of the children require a safe and stable environment to continue the process of building trust and relationships with others that foster feelings of security.  The children require counseling in conjunction with placement in a therapeutic foster home or residential treatment center.  It would be unrealistic to believe the biological parents could continue the children's treatment or meet their physical needs while Nancy is in prison and Charles is working two jobs.  This is particularly so in the absence of any evidence of a competent, family support network.  In addition, based on both parents' reactions to D.D.D.K.'s and C.E.K.'s outcries, it appears both parents are ill-equipped to respond to any future

26

emotional needs resulting from the sexual abuse. This factor also weighs in favor of termination.

The same evidence we held was legally and factually sufficient to support the trial court's findings that termination was appropriate supports a finding that termination is in the best interest of the children because both parents present future emotional and physical dangers to the children. *See In re C.H.*, 89 S.W.3d at 28*; In re M.G.D.*, 108 S.W.3d at 511. The children were repeatedly exposed to sexual abuse; *Green v. Texas Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 221 (Tex.App.–El Paso 2000, no pet.) ("sexual abuse is a significant factor in determining whether termination is in the best interest of the child"), and parental drug abuse*. In re M.R.*, 243 S.W.3d at 820 (drug abuse is a factor in analysis of child's best interest). These facts weigh in favor of termination.

Evidence concerning their parenting abilities and failure to use available programs also suggests termination is in the children's best interests. The record reveals that both parents continued to use drugs after their parental rights were in jeopardy. Only after entering prison was Nancy able to curb her drug use. Although Nancy testified to her current intent to seek drug rehabilitation once she is released from prison, there are no assurances, nor can there be, that she will enter, or complete, such a program and remain a sober and responsible mother to these children. Charles has shown some improvement but, based on evidence of his uncooperative attitude toward counseling and the relatively short time he has remained drug-free, the trial court was entitled to infer that his substance

27

abuse might resume and further jeopardize the children's well-being. Further, based upon the evidence of record of sexual abuse and the parents' reactions to their children's outcries, the trial court was entitled to infer that the parents would not take full advantage of programs available to assuage the effects of such abuse.

That neither parent has a specific plan for the children if they received custody also weighs in favor of termination. *See In re S.M.L.D.*, 150 S.W.3d at 761. Without more, Nancy indicated she wanted her children to join a church and go to counseling. Putting aside Charles's drug abuse issues for a moment, he also offered no concrete plan to assist the children in overcoming the effects of past sexual abuse. Further, although he is saving for a larger place to live, he could not tell the trial court how much was saved and advanced no plan for obtaining an alternative dwelling.

Priest, the children's case worker, testified the children were receiving counseling and their placements were stable. Their plan was for unrelated adoption. She testified that, during the prior year and one half the children had been in foster care, their stay had been relatively unstable due to their exposure to sexual abuse and drug use while living with their parents. Although the children were currently in therapeutic foster homes,[19] C.E.K., Jr. was recently transferred to a residential treatment center because of assaultive behavior. The Department initially sought placement with relatives but no relatives were

---

[19]D.D.D.K. has been in a therapeutic foster home for two and one half months, C.E.K., Jr. for thirteen months, and C.E.K. for three and one half months.

willing or interested. D.D.D.K.'s foster parents, however, have expressed an interest in adoption. These facts also weigh in favor of termination.

From these facts, a fact finder could have formed a firm belief or conviction that termination of Charles's and Nancy's parental rights was in the children's best interests. Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of their parental rights was in the children's best interests. Charles's fourth point of error and Nancy's third issue are overruled.

**CONCLUSION**

The trial court's judgment is affirmed.

Patrick A. Pirtle
Justice
