02-10-186-CV















 

 

 

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

 

NO. 02-10-00186-CV

 

 


 
 
 In the Interest of M.W. and J.B.,
 Children
 
 
  
 
 
  
 
 
 
 
  
  
 
 
 
 
  
 
 
  
 
 
  
 
 


 

----------

 

FROM THE
323rd District Court OF Tarrant
COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

 

I. 
Introduction

          In a single issue, Appellant Father
complains that the evidence is legally and factually insufficient to support
the trial court’s finding that termination of his parental rights is in M.W.’s
best interest.  See Tex. Fam. Code Ann. § 161.001(2) (Vernon 2009).  We affirm.

II.  Background

          Mother, a methamphetamine user who was
unable to stay “clean,” executed voluntary affidavits of relinquishment of her
parental rights before trial.  Father,
incarcerated at the time of trial, appeared in person.  J.B.’s alleged biological father appeared
through his attorney.[2]

          The trial court terminated Father’s
parental rights, finding, among other grounds for termination, that there was clear
and convincing evidence of endangerment and that termination of his parental rights
was in M.W.’s best interest.  See
Tex. Fam. Code Ann. § 161.001(1)(D), (E), (L), (Q),
(2) (Vernon Supp. 2010).  This appeal
followed.

III.  Termination of Parental Rights

Because
Father does not challenge any of the family code section 161.001(1) grounds upon which the trial court based its termination
order, we review only the trial court’s best interest finding under section
161.001(2).

A.  Sufficiency Standards of Review

In
reviewing the evidence for legal sufficiency, we must determine whether the
evidence is such that a factfinder could reasonably
form a firm belief or conviction that the best interest ground was proven.  In re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005).  We must review all the evidence in the light
most favorable to the finding and judgment. 
Id.  This means that we must assume that the factfinder resolved any disputed facts in favor of its
finding if a reasonable factfinder could have done
so.  Id.  We must also disregard all evidence that a
reasonable factfinder could have disbelieved.  Id.  We must consider, however, undisputed
evidence even if it is contrary to the finding. 
Id.  That is, we must consider evidence favorable
to termination if a reasonable factfinder could, and
disregard contrary evidence unless a reasonable factfinder
could not.  Id.

          We must therefore consider all of the
evidence, not just that which favors the judgment.  Id.  But we cannot weigh witness credibility
issues that depend on the appearance and demeanor of the witnesses, for that is
the factfinder’s province.  Id. at 573, 574.  And
even when credibility issues appear in the appellate record, we must defer to
the factfinder’s determinations as long as they are
not unreasonable.  Id. at 573.

          In reviewing the evidence for factual
sufficiency, we must give due deference to the factfinder’s
findings and not supplant the judgment with our own.  In re H.R.M., 209
S.W.3d 105, 108 (Tex. 2006). 
Here, we must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or
belief that the termination of the parent-child relationship would be in the
best interest of the child.  Tex. Fam. Code Ann. § 161.001(2); In re C.H., 89 S.W.3d 17, 28 (Tex. 2002).  If, in light of the entire record, the
disputed evidence that a reasonable factfinder could
not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief
or conviction in the truth of its finding, then the evidence is factually
insufficient.  H.R.M., 209 S.W.3d at 108.

B. 
Best Interest Factors

There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.  In
re R.R., 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and permanent placement of the child
in a safe environment is also presumed to be in the child’s best interest.  Tex. Fam. Code Ann. §
263.307(a) (Vernon 2008).  In
addition to the factors set out in family code section 263.307(b), other
nonexclusive factors that the trier of fact in a
termination case may use in determining the best interest of the child include:


(A)     the desires of the
child;

 

(B)     the emotional and
physical needs of the child now and in the future;

 

(C)     the emotional and
physical danger to the child now and in the future;

 

(D)     the parental
abilities of the individuals seeking custody; 

 

(E)     the programs
available to assist these individuals to promote the best interest of the
child;

 

(F)     the plans for the
child by these individuals or by the agency seeking custody;

 

(G)     the stability of
the home or proposed placement;

 

(H)     the acts or
omissions of the parent which may indicate that the existing parent-child
relationship is not a proper one; and

 

(I)      any excuse for the acts or omissions of
the parent.

 

Holley
v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976); see also Tex. Fam. Code Ann. §
263.307(b); R.R., 209 S.W.3d at 116.

          These factors are not exhaustive; some
listed factors may be inapplicable to some cases; other factors not on the list
may also be considered when appropriate. 
C.H., 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one
factor may be sufficient in a particular case to support a finding that
termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.

C.  Evidence

At
the time of the trial, M.W. was eight years old.  Tonyia Brown, the
Department of Family and Protective Services (DFPS) conservatorship worker,
testified that M.W. and her younger brother J.B. were with the same foster
family and doing well; M.W. was happy, enjoyed her school, had friends, and
told Mother that if she could not go home, she would like to stay with the
foster family—her third move since her removal. 
DFPS’s plan for the children was for them to be adopted together by the
foster family.  Brown recommended
terminating the parents’ rights as in the children’s best interest.

          At the time of trial, Father was
incarcerated on his 2009 convictions for aggravated assault of a peace officer
with a deadly weapon (twenty-five years’ confinement), unlawful possession of a
firearm by a felon (ten years’ confinement) and possession of a prohibited
weapon (twenty years’ confinement), on appeal at the time of the termination
trial.  Father’s earliest parole eligibility
date was 2017.

Father
also testified that he had prior convictions for “aggravated robbery of a dope
dealer” in 2009, for which he received nine months’ time served and paid
restitution; for possession of a controlled substance with intent to deliver in
2002, for which he received two years’ confinement; and for DWI in 2000, for
which he received two years’ community supervision, which was subsequently
revoked for “dirty UAs,” resulting in twelve days’ incarceration in county
jail.  Father stated that he had been
diagnosed paranoid schizophrenic with manic depression, bipolar, ADHD, and
dyslexia and that he took medication for these conditions.  He added that his mental illness was the basis
for his appeal from his criminal convictions.

A
Child Protective Services (CPS) plan was developed for Father, but he did not
complete any services while incarcerated.  Father proposed his mother, V.W., and his
father, G.W., as potential placements for M.W. 
He stated that he wanted V.W. to take M.W. and that he had no doubts
that she could take care of M.W.  If V.W.
could not take M.W., then Father agreed that adoption was the best alternative,
giving the following testimony:

Q.  Okay. 
And if your appeal is not successful, how long do you think [M.W.]
should wait in foster care for you to get out?

 

A.  I don’t think she should wait.

 

Q.  All right. 
You think she needs to be adopted and be able to move on with her life?

 

A.  I don’t want to give my rights up.

 

Q.  Okay. 
Even though you don’t want to give your rights up, what do you think is
in [M.W.’s] best interest?  What should
happen to this kiddo who is eight years old? 
How long should she have to wait in foster care for you to get out?

 

A.  I don’t believe she should have to wait in
foster care if my mom was to get her.

 

Q.  And if she’s not a placement option, if CPS
or the Court says placement with your mother is not an option, then how long do
you want [M.W.] to stay in foster care?

 

A.  She would be an adult by the time I got out.

          

Q.  Okay. 
So you think she ought to be freed for adoption or she should just be a
foster kid until she gets to be 18?

 

A.  I don’t know, ma’am. . . .  Can you rephrase the question?

 

Q.  Do you have an opinion on whether or not
[M.W.] should stay in foster care and be a foster kid until she’s 18, or should
she be adopted if that’s an option?

 

A.  Adopted. 

 

G.W.
was convicted of indecency with a child in 1989, which Brown testified would
prohibit DFPS from recommending placement with him.  The complainant was his teenaged stepdaughter.
 V.W. testified that she was living with
G.W. when the offense occurred but that she did not recall how old the
complainant had been.  She added that she
did not think that giving G.W. custody of M.W. would be a good decision.  G.W. testified that he approved of V.W. as a
placement for the children, that he goes to V.W.’s place of employment and
talks with her almost every other day, and that he would be willing to forego
unsupervised visits with the children if that meant V.W. could have them.  G.W. added that one of the reasons he and V.W.
had not gotten a divorce was the possibility of reconciliation. 

V.W.
testified that she and G.W. had been separated for seven years and that she
planned to divorce G.W. when she had the money for it.  At the time of trial, she lived with her
boyfriend, who had a 1982 DWI conviction and a pending DWI charge.  When asked whether she thought it was a
positive influence for a nine-year-old child to live in a home “where someone
is married to someone else but living together and shacking up,” V.W. replied
that she had a very loving family, had raised five children (but later said she
had four children), and was a good mother and grandmother.  Brown testified that V.W.’s boyfriend’s
criminal history would prevent M.W.’s placement with V.W. and that V.W. had
chosen to continue living with the boyfriend rather than evict him so that M.W.
could stay with her.

V.W.
claimed that she did not know M.W. was in CPS’s custody for six months because
M.W.’s mother “had a habit of running around different places and living
different places, and we didn’t get to have contact with her.”  She stated that the last time she had contact
with M.W. was “probably a year before this had occurred” because M.W.’s mother
had been living in Louisiana with another man.[3]  She stated that she did not know the children
were in danger because she never witnessed M.W.’s mother do anything to her
children and did not know, until she went to CPS to find out where M.W. was, that M.W.’s mother had a drug problem.  V.W. stated she was willing to take both M.W.
and J.B.

Brown
stated that since she took the case in January 2010, V.W. had five months to
offer her home as a potential placement for M.W., but she had not. V.W.
disputed this, stating that she had always let CPS know that she was interested
in having M.W. placed with her.  However,
V.W. admitted that she had never spoken with Brown and that the only person she
talked with about placement at the April 22, 2010 review hearing was Father’s
attorney.

V.W.
also admitted that she was told that if her boyfriend left the residence, she
could have visitation with M.W. and that he had not left the residence.  She said she would not put him out until she
was told she could get the children because he helped with her bills.  However, she also testified that she no longer
needed him to help her with her trailer payments because she had just received
a raise.  She stated that she had just
become financially stable enough to adopt the children.

V.W.
testified that Father was the only one of her children who was incarcerated,
that he had been in prison this time for six years, and that the last time she
had visited him had been six months earlier because of the seven-hour drive to
the prison.  She stated that she did not
think there was anything Father could have done, if he had been free, to keep
M.W. from being placed in foster care “because he wasn’t really allowed—we
weren’t allowed to be a part of her life.” 
She replied, “No, I don’t,” when asked whether she thought Father should
have made sure he was free so that he could ensure M.W.’s
safety and well-being.

D.  Analysis

Father
complains that DFPS did not meet its obligation to perform a background and
criminal history check of relatives—specifically V.W.—as potential caregivers
under family code section 262.114,[4] although
he admits that this would not prevent the trial court from terminating his
parental rights.  However, the record
reflects that on December 18, 2009, a “Child Caregiver Resource Form Report to
the Court” was filed with the trial court, which states that the children were
not placed with V.W. because “[i]nsufficient
information was provided to the department to complete background checks on
[V.W.’s] live in paramour.”  The report
describes the actions taken by DFPS to place the children with V.W.:

A kinship referral was made for placement of [M.W.] and [J.B.] with
[V.W.], paternal grandmother of [M.W.]  Efforts were made to complete the home
study, but the assigned contract provider was unable to meet with . . .
[V.W.’s] paramour, [D.M.], in order to complete background checks and interview
him for the home study. Furthermore, the assigned CPS caseworker, Pamela Gillinger, met with [V.W.] face to face in November, and
requested identifying information for [D.M.]  However, [V.W.] reported that she did
not have his identifying information, and provided a phone number instead.  Pamela Gillinger
attempted to contact [D.M.] by phone and left messages requesting the
information.  Ms. Gillinger
has also attempted to contact [V.W.] again in December to get contacting
information for [D.M.] by leaving messages on her voice mail with no return
call.  [Emphasis added.] 

V.W.
testified that CPS had come to her house and described an argument she had had
with CPS before Christmas, stating,

I wasn’t aware that I
was turned down on the home visit.  I
didn’t hear anything after that.  It was
just—it got to the point where when we talked about [M.W.] coming to my house
for Christmas, which we still have gifts and everything for that, and we talked
about that.  Then I was called in Ms. Gillinger’s office, and I don’t remember the other lady’s
name—her supervisor—came in the office, too, and then she was coming in and she
was going, well, how do I know that you’ll do this and do that or something?  I can’t remember what we were talking about,
and then I told Ms. Bailey at that time, I’ve raised five children successfully
and never had a child case against me, so I don’t know why you’re acting like
that, that I’m—you know, that I’m going to do something at that point, and then
she said, well, I have to get it okayed, and then I’ll contact you back if
you’re able to have your grandchildren. 
I had the whole family at my house Christmas waiting for that phone call.  I never got that phone call.

 

Gillinger was
no longer with CPS by the time of trial, but Brown testified that V.W. “was
supposed to have had the children during the Christmas holiday and did not pick
the children up for their visit, and we have not heard from her.”  The trial court had the responsibility to
determine the witnesses’ credibility.  See J.P.B.,
180 S.W.3d at 573.

Furthermore,
during his testimony, Father agreed that adoption would be the best alternative
for eight-year-old M.W. if V.W. could not take her, and the trial court could
have reasonably agreed after hearing Father’s testimony about his numerous
convictions, his mental health problems, and the length of his prison
sentences, and after hearing about Father’s failure to work any of his CPS
service plan while incarcerated.  See In re M.R., 243 S.W.3d 807, 821
(Tex. App.—Fort Worth 2007, no pet.) (recognizing
parent’s failure to comply with service plan may be factor, among others,
supporting best interest finding).

The
trial court could have also found that placement of M.W. with V.W. would not be
in M.W.’s best interests:  V.W. had been
unwilling to give up her boyfriend and his financial support in order for M.W.
to be placed with her while the termination case was pending.  And the trial court could have formed a firm
conviction or belief that adoption by her foster parents was safer for M.W.
than to place her with V.W., as V.W. had lived with G.W. at the time he
committed indecency with a child with his stepdaughter, had failed to maintain
contact with M.W. for a year prior to M.W.’s removal, and had continued to live
with her boyfriend despite remaining married to, and having almost daily
interaction with, G.W.  Finally, Brown
testified that M.W.’s preference, if she could not be with her mother, was to
stay with the foster family, and that M.W. was happy and was doing well with
the foster family.  See Holley, 544 S.W.2d at 371–72.

Based
on our review of the entire record, we conclude that the trial court could
reasonably have formed a firm belief or conviction that termination of Father’s
parental rights to M.W. was in M.W.’s best interest.  See
J.P.B., 180 S.W.3d at 573; C.H., 89
S.W.3d at 28.  Therefore, we hold that
the evidence is legally and factually sufficient to support the trial court’s
best interest finding.  We overrule
Father’s sole issue.

IV.  Conclusion

Having
overruled Father’s sole issue, we affirm the trial court’s judgment.

 

 

PER CURIAM

 

PANEL:  MCCOY, GARDNER, and
WALKER, JJ.

 

DELIVERED:  January 6, 2011











          [1]See Tex. R. App. P. 47.4.





[2]The
trial court terminated Mother’s parental rights based on the affidavits of
relinquishment and the children’s best interest.  It terminated J.B.’s alleged father’s parental
rights based on constructive abandonment and J.B.’s best interest.  J.B.’s father does not appeal, nor does
Mother.





[3]V.W.
argued that it was not her fault that she had lost contact with M.W., stating,
“You’re cross-examining me like I’ve done something wrong, and [M.W.’s] mother
was the one that kept moving her from Louisiana to different places.”





[4]Section
262.114 states,

(a) Before
a full adversary hearing . . . [DFPS] must perform a background and criminal
history check of the relatives or other designated individuals identified as a
potential relative or designated caregiver . . . .  The department shall evaluate each person
listed on the form to determine the relative or other designated individual who
would be the most appropriate substitute caregiver for the child and must
complete a home study of the most appropriate substitute caregiver, if any,
before the full adversary hearing. . . . 

. . . .

(a-2) If the
child has not been placed with a relative or other designated caregiver by the
time of the full adversary hearing . . . the department shall file with the
court a statement that explains:

(1) the
reasons why the department has not placed the child with a relative or other
designated caregiver listed on the proposed child placement resources form; and

(2) the actions the department is taking, if any, to place the
child with a relative or other designated caregiver.

(b) The
department may place a child with a relative . . . if the department determines
that the placement is in the best interest of the child. . . . 

(c) The
department shall consider placing a child who has previously been in the
managing conservatorship of the department with a foster parent with whom the
child previously resided if:

(1) the
department determines that placement of the child with a relative or designated
caregiver is not in the child’s best interest; and

(2) the placement is available and in the child’s best interest.

Tex. Fam. Code Ann. § 262.114 (Vernon Supp. 2010).